Melvin D. **REUBER**, Appellant

v.

**UNITED STATES of America, et al. (Two cases.)**

Melvin D. **REUBER**, Appellant

v.

**FOOD CHEMICAL NEWS, et al. (Two cases.)**

Nos. 82–2376, 82–2414, 83–1536 and 83–1537.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 3, 1984.

Decided Dec. 7, 1984.

As Amended Jan. 23, 1985.

Bork, Circuit Judge, filed opinion concurring in part.

Starr, Circuit Judge, filed opinion dissenting in part and concurring in part.

Raymond D. Battocchi, Washington, D.C., with whom Isaac N. Groner, Judith E. Olingy, Daniel S. Goodman, Steven F. Korostoff and P. Scott Marshall, Washington, D.C., were on the brief, for appellant in Nos. 82–2376, 82–2414, 83–1536 and 83–1537.

Leonard E. Cohen, Baltimore, Md., with whom Frances E. Kanterman, Baltimore, Md., was on the brief for appellees, Litton Industries, Inc., et al. in Nos. 82–2376, 82–2414, 83–1536 and 83–1537.

Rebecca L. Ross, Asst. U.S. Atty., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief for appellees, United States of America, et al. in Nos. 82–2376, 82–2414, 83–1536 and 83–1537.

Aaron L. Handleman and Waldemar J. Pflepsen, Jr., Washington, D.C., entered appearances for appellee, Food Chemical News in Nos. 82–2376, 82–2414, 83–1536 and 83–1537.

Before WALD, BORK and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Opinion concurring in part and concurring as to the judgment only in Part IV filed by Circuit Judge BORK.

Opinion dissenting in part and concurring in part filed by Circuit Judge STARR.

WALD, Circuit Judge:

Plaintiff Dr. Melvin D. Reuber, appeals the district court's dismissal of his Federal Tort Claims Act (FTCA) suit against the United States, and his constitutional tort and common law claims against several federal officials, Litton Industries, Inc. (Litton), Litton Bionetics, Inc. (Bionetics), and numerous employees of Bionetics.[1] Reuber's suits are grounded in the issuance and dissemination of a letter of reprimand from his employer, Bionetics, charging that he mischaracterized personal research as work done under the auspices of the Frederick Cancer Research Center (FCRC), where Reuber worked, and that he did this personal research on company time. The district court in dismissing his claim held that venue did not lie in the District of Columbia for Reuber's FTCA claim or his claims against the individual defendants, that in addition the court lacked personal jurisdiction over the individual defendants, and finally that Reuber's allegations that Litton and Bionetics violated his constitutional rights were insufficient to confer subject matter jurisdiction. It further refused to exercise pendent jurisdiction over the common law claims against the corporate defendants.

We affirm the dismissal of the FTCA actions against the United States and the constitutional and common law tort claims

---

1. The district court retained jurisdiction over Reuber's Privacy Act claim against the United States. On September 6, 1984, the district court dismissed all claims for damages under 5 U.S.C. § 552a but ordered the Department of Health and Human Services and the Environmental Protection Agency to destroy all copies of the March 26, 1981, letter in their possession.

against the individual defendants generally for the reasons stated by the district court. We reverse the district court's dismissal of constitutional and pendent state claims against the two corporate defendants, Litton Industries, Inc., and Litton Bionetics, Inc., and remand these claims to the district court.

## I. FACTUAL BACKGROUND

### A. *Events Prior to 1981*

From 1976 to April, 1981, Reuber, a Maryland resident, worked as a research pathologist at FCRC, a government-owned facility located in Maryland, which Bionetics operates pursuant to a cost-plus contract with the National Cancer Institute (NCI).[2] Until 1981, Reuber's employer, Bionetics, was apparently pleased with his work; as late as November, 1980, defendant Dr. Michael Hanna, Director of FCRC, rated Reuber's job performance as outstanding, and earlier in 1981 Reuber was picked to head FCRC's Experimental Pathology Laboratory. *See* Deposition of Michael George Hanna, *Reuber v. United States*, Civ. No. 81–1857 [hereinafter cited as Hanna Dep.].[3]

During this time FCRC encouraged Reuber to do personal research on his own time. Reuber contends that FCRC's policy allowed researchers to take up to one day a week off from official work to engage in "scholarly activities," *see* Deposition of Melvin D. Reuber at 196–99 [hereinafter cited as Reuber Dep.], which he interpreted to include personal research. Thus, Reuber conducted several studies based on review of NCI slides available at Tracor Jitco,

a repository in Maryland for NCI slides. *Id.* at 29–30. He submitted several of these studies for publication without first clearing them through FCRC and NCI. Reuber also completed numerous FCRC-sponsored studies, which he did subject to the FCRC and NCI clearance process prior to submittal for publication. Unlike his personal research, these studies were required to expressly state:

> [t]he work upon which this publication is based was performed pursuant to [the FCRC] Contract ... with the [NCI].

*Id.*, Exh. 4.[4]

In one personal study Reuber submitted for publication in 1979 dealing with the "carcinogenicity of malathion," *see Reuber v. United States*, Civ. No. 81–1857, slip op. at 1 (D.D.C. Aug. 25, 1982) (Memorandum Opinion),[5] he reported that after examining 24,000 slides used in prior NCI studies,[6] he concluded contrary to the results of these studies that malathion did cause cancer in test mice and rats.

### B. *Events Leading to the Letter of Reprimand*

In late 1980, Reuber's malathion paper attracted publicity when the United States Department of Agriculture sought to conduct aerial spraying with malathion in California in an effort to eradicate the mediterranean fruit fly, which threatened the state's agricultural industry. Upon request, Reuber sent a copy of his malathion study to Chris Jenkins, an employee of the John Muir Institute in Berkeley, California. Reuber put his office address at FCRC on the paper, which apparently led Jenkins and others at the John Muir Institute to

---

2. NCI is part of the United States Department of Health and Human Services (HHS) and, like FCRC, is located in Maryland.

3. Unless otherwise specified, all citations to the district court record, depositions and exhibits are to those in *Reuber v. United States*, Civ. No. 81–1857 (D.D.C. Oct. 27, 1982).

4. For at least one personal research study, however, involving the carcinogenicity of picloram, Reuber admits he did have an FCRC secretary type and photocopy the manuscript; he also wrote a cover letter to the Journal of Toxicology

and Environmental Health (which published the study) on FCRC stationery using FCRC envelopes and postage. *See* Reuber Dep. at 78–79.

5. This paper was never published because Reuber withdrew it before publication. *See* Reuber Dep. at 78–79.

6. These studies originally were done by pathologists at the NCI's facility operated by Gulf South Research Institute. *See* Brief for Appellee United States, *Reuber v. United States*, Nos. 83–1536, 83–1537, at 2.

assume the work was sponsored and approved by FCRC and NCI. According to the government, this misconception was furthered by the John Muir Institute's distribution of a packet which "cited Reuber's study as that of FCRC/NCI." Brief for Federal Appellees, No. 83–1536, at 4.

Following the distribution of Reuber's paper, NCI officials began receiving a succession of telephone calls asking who Reuber was, and whether NCI still stood behind its conclusions in prior studies that malathion was not carcinogenic. *See* Brief for Appellee United States, No. 83–1536 at 8.[7] In addition, a letter from a California official to NCI complaining about Reuber's study was forwarded to defendants Adamson and Hartwell, both officials at NCI.

Hartwell and Adamson began an investigation. Hartwell contacted Dr. James Liverman at Bionetics and alerted him to the controversy prompted by Reuber's study. According to Reuber, Hartwell subsequently accused him of misusing · government funds and misrepresenting himself as an NCI employee. *See* Brief for Appellant, No. 82–2376, at 14. Liverman relayed these allegations to defendant James Nance, President of Bionetics, who in turn notified FCRC Director Hanna of them.

At the same time, according to the government, Adamson checked with NCI pathologists and other scientists involved in the original malathion studies and concluded that their negative findings on the carcinogenicity of malathion were correct. *See* Brief for Federal Appellees, No. 83–1536, at 9. He contacted Hanna with this information.

The parties disagree about the events that ensued. According to the government, "Dr. Hanna took the matter over from there." Brief for Federal Appellees, No. 83–1536, at 10. Hanna originally wanted to fire Reuber, but was convinced not to do so by defendant Dr. Vincent DeVita, the director of NCI and the person ultimately responsible for the review of Bionetics'

FCRC contract. *Id.* Hanna instead drafted a strong letter of reprimand, and despite suggestions by defendant Dr. William Payne, an NCI official, to "tone it down a bit," sent it as originally drafted. *Id.*

According to Reuber's version, on the other hand, Hanna was pressured into disciplining Reuber by NCI officials who were "very upset" by Reuber's reinterpretation of the NCI [malathion] studies and his labelling as carcinogenic chemicals that NCI had found to be noncarcinogenic. Brief for Appellant, No. 82–2376, at 17. Reuber alleges that Hartwell "went around the NCI telling people that this time he was 'going to get' plaintiff." *Id.* He also claims that, although NCI generally does not make employment decisions regarding Bionetics' employees at FCRC, Adamson instructed Hanna to call Reuber to "straighten ... out" matters, *id.*, and "DeVita ... insisted" that Hanna write the letter of reprimand. Brief for Appellant, No. 83–1536, at 11.

C. *Publication of the Letter of Reprimand*

Hanna's letter of reprimand, dated March 26, 1981, admonished Reuber for "mishandling of scientific data and unrestrained interpretations of those data, ... [and] operat[ing] under the guise of the endorsement of both NCI and [FCRC]." Docket No. 12, *Reuber v. United States*, No. 82–2376 (filed Sept. 17, 1981). The letter stated that Reuber's "obstreperous actions" created a "public distrust and lack of confidence in ... [NCI] authorities who administer the carcinogenesis testing program," and gave "the impression that the NCI may be administering programs of questionable competency." *Id.* Hanna ordered that Reuber thereafter "adhere to the rigid policy of internal scientific review and clearance through [Hanna's] office and through [NCI] administrative offices" for "all publications that [Reuber] is associated with." *Id.*

---

**7.** Citations to briefs in *Reuber v. United States*, Nos. 83–1536, 83–1537, are denoted by "No. 83–1536"; citations to briefs in *Reuber v. United States*, Nos. 82–2376, 82–2414 are denoted by "No. 82–2376."

Hanna sent copies of this letter to defendants DeVita, Adamson, Hartwell and Payne, all of whom are NCI officials, as well as to defendants Nance and I.J. Fidler at Bionetics. Several of the recipients showed the letter to other people at NCI and Bionetics. *See* Brief for Appellee, No. 83–1536, at 12. Shortly thereafter, an unknown person or persons posted the letter on Environmental Protection Agency (EPA) bulletin boards in the District of Columbia. *See* Joint Appendix, No. 83–1536, at 115 [hereinafter cited as J.A.]. Reuber alleges that the letter was "freely circulated by pesticide industry lobbyists around Washington [D.C.]" *See* Brief for Appellant, No. 83–1536, at 13. Eventually, news of the reprimand with substantial excerpts from the letter was published in *Food Chemical News,* a District of Columbia trade publication.

Reuber alleges that the publicity about the reprimand greatly upset him and caused a high blood pressure condition which endangered his physical health. *See* Brief for Appellant, No. 83–1536, at 13. On April 24, upon the advice of his doctor, Reuber resigned from his job at FCRC. He then filed suit in federal courts in both the District of Columbia and Maryland as well as in the Maryland state court.[8]

## II. VENUE FOR THE FTCA CLAIM

■ The United States contested Reuber's FTCA action on grounds of improper venue. The applicable venue provision states:

Any civil action on a tort claim against the United States under [the FTCA] may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred.

28 U.S.C. § 1402(b). The district court held that venue was improper since "plaintiff's tort claim against the United States occurred in Maryland. It was in Maryland that the letter [of reprimand] was written, given to plaintiff and maintained [in NCI and FCRC files]." *Reuber v. United States,* Civ. No. 81–1857, slip op. at 6 (D.D.C. Oct. 27, 1982) (Memorandum Opinion) [hereinafter cited as *Memorandum Opinion* ]. The district court also rejected Reuber's arguments that venue was proper in the FTCA claim as pendent to his continuing Privacy Act claim. *See supra* note 1. It concluded that the FTCA venue provision, by permitting a tort claim to be brought *only* in the district where the plaintiff resides or where the act occurred, forecloses application of any discretionary pendent venue doctrine. *Id.* at 7. Second, it held that Reuber's Privacy Act claim was not sufficiently related to his FTCA claim for invasion of privacy, negligent maintenance of records, and intentional infliction of emotional distress, to support application of the doctrine of pendent venue. *Id.*

Reuber contends on appeal that "the acts or omissions giving rise to these torts occurred, at least in part, in this District." Brief for Appellant, No. 83–1536, at 19. He points to the fact that the letter of reprimand was eventually leaked to the Food Chemical News, which is published in the District, and that the letter was additionally posted by unknown persons on bulletin boards at the EPA headquarters also located in the District. But the answer to his claim is that the United States can be held liable under the FTCA only for the tortious acts of its employees, *see* 28 U.S.C. § 1346(b), and Reuber can point to no act in

8. Reuber filed *Reuber v. United States,* Civ. No. 81–1857, on August 6, 1981, in the United States District Court for the District of Columbia, against appellees, along with Food Chemical News, Inc. He filed *Reuber v. Food Chemical News, Inc.,* Civ. No. 82–1033, on March 22, 1982, in the Superior Court of the District of Columbia asking for the same relief against the same parties except the United States and HHS. The *Food Chemical News* suit was removed to the D.C. district court and consolidated with *Reuber v. United States.* In March, 1982, Reuber filed *Reuber v. Litton Industries, Inc.,* Law No. 60387, in the Circuit Court for Montgomery County, Md. *Litton* was removed to the United States District Court for the District of Maryland. Since then, Reuber's case against Food Chemical News has been transferred to the district court in Maryland and the United States added as a defendant to his FTCA claim in that suit. *See* Memorandum, *Reuber v. United States,* Civ. No. 81–1857 (D.D.C. May 4, 1983).

the District by any government employee that caused him any tortious injury.

Reuber also cites *Forest v. United States*, 539 F.Supp. 171 (D.Mont.1982), in support of his argument that venue lies in the District. *Forest* held that when air traffic controllers located in Utah radioed instructions to a pilot flying over Montana, causing that pilot to crash, the "act or omission" occurred in Montana, since the radio communications did not "become tortious" until received by the pilot. *Id.* at 175–76. *Forest*, however, is distinguishable from the present case. It involved a radio transmission directed specifically to the pilot in Montana, the situs of the "act" could thus be reasonably perceived as including the place at which it was targeted and where the foreseeable harm would occur. So viewed, *Forest* stands only for the proposition that, when an individual's conduct occurs in one district but has intended effects elsewhere, the act "occurs" in the jurisdiction where its effects are directed. In this case, unlike *Forest*, Reuber pointed to no tortious conduct of any government employee aimed at the District, or even any conduct which foreseeably would produce consequences in the District; in particular, he identified no specific transmission of the letter or any other adverse information into the District by any federal employee.

Reuber invites us to extend *Forest's* rationale, however valid on its own facts, well beyond that factual context so as to make these defendants' limited dissemination of the letter in Maryland "occur" wherever the letter was ultimately disseminated causing Reuber harm. Unfortunately for Reuber, the Supreme Court has already rejected a reading of the place where "the act or omission occurred" as including any place where the conduct causes injury, albeit it did so for purposes of determining the appropriate state law to apply in an FTCA claim under 28 U.S.C. § 1346(b).[9] *See Richards v. United States*, 369 U.S. 1, 9–10, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962) (Oklahoma law applies to FTCA suit grounded on a plane crash in Missouri caused by negligent failure to enforce regulations that prohibited the practices used by the airline at its overhaul depot in Oklahoma); *cf. Sami v. United States*, 617 F.2d 755, 761 (D.C.Cir.1979) (foreign country exception to the FTCA does not apply where tortious act or omission occurs in the United States since "[t]he entire scheme of the FTCA focuses on the place where the negligent or wrongful act or omission of the government employee occurred"). Although the *Richards* Court did not decide the proper interpretation of the phrase "where the act or omission occurred" for purposes of venue, we share its inability "to conceive of any more precise language Congress could have used than the words it did employ in the Tort Claims Act." *Richards*, 369 U.S. at 9, 82 S.Ct. at 591.[10] We

---

9. Under section 1346(b) the law of "the place where the act or omission occurred" controls. 28 U.S.C. § 1346(b). Thus, the *Richards* Court was faced with the identical issue—deciding in which district the act or omission occurred—as we face in interpreting the FTCA venue provision, section 1402(b).

There is some small support for Reuber's position in the legislative history of section 1402(b). Francis Shea, then Assistant Attorney General of the United States, testifying before the House Committee on the Judiciary, stated in response to a question about where a claimant could sue under the FTCA, that the venue provision allowed suit to be brought either where the claimant resides or where the injury took place. Hearings before the House Committee on the Judiciary on H.R. 5373 and H.R. 6463, 77th Cong., 2d Sess. 9, 30. The Supreme Court, however, has already dismissed this very statement as not controlling in the context of deciding where the "act or omission" occurs for purposes of choosing the applicable state law. Like the Supreme Court, "we are not persuaded to allow [this] isolated piece of legislative history to detract from the [section 1402(b)] words Congress expressly employed." *Richards v. United States*, 369 U.S. 1, 9 n. 20, 82 S.Ct. 585, 591 n. 20, 7 L.Ed.2d 492 (1962).

10. The *Richards* Court did note that "considerations underlying the problem of venue are substantially different from those determining applicable [state] law." 369 U.S. at 9 n. 20, 82 S.Ct. at 591 n. 20. In this case, however, we do not believe that the underlying consideration of the venue requirement, namely the parties' convenience, justifies any departure from a literal reading of the FTCA venue provision, since all of the parties, most witnesses, and most of the evidence are located in Maryland. *See infra* text at n. 18.

thus decline Reuber's invitation to adopt and expand *Forest's* rationale, and we find that Reuber has not alleged an act in the District which makes venue over his FTCA claim proper.

We also reject Reuber's attack on the district court's denial of pendent venue over his FTCA claim. Albeit there is no precedent in this circuit dealing with the general availability of pendent venue, we do not address that issue here, for assuming pendent venue is available as a theory, the district court was justified in refusing to apply it in this case. Pendent venue, like pendent jurisdiction, aims to promote judicial economy as well as convenience and fairness to the parties. *See Seamon v. Upham,* 563 F.Supp. 396, 398–99 & nn. 2–3 (E.D.Tex.1983); *cf. United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (efficiency, convenience and fairness rationales for pendent jurisdiction). In deciding whether to invoke pendent venue a district court must consider the same factors that bear on economy and convenience as in deciding whether to exercise pendent jurisdiction: whether the pendent and principal claims arise out of a common nucleus of operative facts; whether they present common issues of proof; whether they involve the same witnesses. *See Travis v. Anthes Imperial Limited,* 473 F.2d 515, 529 (8th Cir.1973) (pendent venue lies for "essentially the same reasons as ... pendent subject matter jurisdiction"); *Seamon,* 563 F.Supp. at 399 & n. 3. The judicial efficiency rationale for pendent venue makes it clear that "a district court has wide discretion to refuse to hear a pendent claim." *United States v. Capeletti Brothers, Inc.,* 621 F.2d 1309, 1317–18 (5th Cir.1980) (discussing pendent jurisdiction); *see also Doe v. Board on Professional Responsibility,* 717 F.2d 1424, 1428 (D.C.Cir.1983) (district

court decision to assume pendent jurisdiction is "entitled to substantial deference on appeal ...").

In this case, although Reuber's Privacy Act claim and his FTCA claim arise from overlapping nuclei of operative fact, they present many distinct issues of proof. Reuber's Privacy Act claim will require proof as to the propriety of maintaining a record of Reuber's alleged misconduct in NCI files, *see* 5 U.S.C. § 552a(e)(1), the dissemination of the letter and other information in NCI files by federal officials to persons outside of NCI who had no need to know of Reuber's alleged misconduct, *see* 5 U.S.C. § 552a(b)(1), and the actual damages, if any, Reuber suffered as a consequence of any Privacy Act violation, *see* 5 U.S.C. § 552a(g)(4). Reuber's FTCA invasion of privacy claim, on the other hand, will raise questions about the private versus public nature of the information, its offensiveness to a reasonable person, and its counterbalancing newsworthiness, and may involve inquiries into issues relating to special damages. *See* Restatement (Second) of Torts, § 652D (1976). In addition to considering the likely requirement of differing proof, the convenience and fairness of allowing the FTCA claim to proceed in federal court here, must be assessed in light of the general rule that, when the United States waives sovereign immunity, it may choose the conditions under which a suit against it is to proceed.[11] *Lehman v. Nakshian,* 453 U.S. 156, 161, 101 S.Ct. 2698, 2701, 69 L.Ed.2d 548 (1981) ("limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied"). Here Congress has specified the district in which the act occurred as the "only" district, other than that where the plaintiff resides, where a claim may be brought, *see* 28 U.S.C.

---

**11.** "The United States, as sovereign, is immune from suit save as it consents to be sued, ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769–770, 85 L.Ed. 1058 (1941) (citations omitted). Thus, it is unclear whether

a district court even has jurisdiction to hear an FTCA claim anywhere but in the district specified by 28 U.S.C. § 1402(b). We need not decide this question, since we hold that dismissal of Reuber's FTCA claim was properly within the district court's discretion.

§ 1402(b), and thereby created a strong negative presumption against courts finding discretionary pendent venue elsewhere. Finally, consideration of judicial economy must keep in mind that Reuber has identical claims to those considered here, including an FTCA action, already pending in federal district court in Maryland, *see supra* at n. 8. These reasons seem to us amply to support the district court's refusal to exercise pendent venue over Reuber's FTCA claim.

### III. CLAIMS AGAINST INDIVIDUAL DEFENDANTS

#### A. *Personal Jurisdiction*

■ The district court found that it had no personal jurisdiction over any of the individual defendants. Since none of them resides in the District, personal jurisdiction may be invoked over them only pursuant to the District of Columbia's long-arm statute. That statute provides, in relevant part: ˙

A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by agent, as to a claim for relief arising from the person's—

. . . .

(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, [or] engages in any other persistent course of conduct ... in the District of Columbia.

D.C.Code Ann. § 13–423(a).

The district court found no personal jurisdiction under section 13–423(a)(3) because Reuber adduced no evidence of any tortious act occurring in the District.[12] Reuber contests this finding, arguing that "[i]n connection with torts such as defamation, a non-resident defendant never physically present in a state can commit an 'act' in that state when he causes a communication to be published there." He notes that many jurisdictions have held that a person commits an act in a state, for purposes of personal jurisdiction, when he sends a libel into that state. *See, e.g., Buckley v. New York Post Corp.*, 373 F.2d 175 (2d Cir. 1967); *Jones v. Calder*, 138 Cal.App.3d 128, 187 Cal.Rptr. 825 (1982), *aff'd on other grounds*, — U.S. —, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). He argues that these cases support a holding here that for purposes of conferring personal jurisdiction the individual defendants' revelation of the letter to a limited number of people in Maryland somehow occurred in the District because "it caused a communication [the letter] to be published there." Brief for Appellant, No. 83–1536, at 34.

However appealing to our reasoning the rationale of these cases might be, the law in this jurisdiction is otherwise. We have consistently held that libelous telephone calls into the district are not acts within the District conferring personal jurisdiction over the caller under section 13–423(a)(3). *See Tavoulareas v. Comnas*, 720 F.2d 192, 193–94 (D.C.Cir.1983); *Margoles v. Johns*, 483 F.2d 1212 (D.C.Cir.1973).

Even if our prior cases had adopted the view of the cases Reuber cites, his argument would not prevail, for it fails to distinguish between actions expressly aimed at the District, like sending a publication or letter or making a telephone call into the District, and actions which merely cause harm in the District. The language of section 13–423(a)(3) clearly requires more than an "act" that causes harm in the District;

**12.** The appellees contend that the district court also found no evidence of injury to Reuber in the District. *See* Brief for Federal Appellees, No. 83–1536, at 17 (citing *Memorandum Opinion*, slip op. at 11). The Supreme Court recently stated, however, that "[t]he reputation of the libel victim may suffer harm even in a state in which he has hitherto been anonymous." *Keeton v. Hustler Magazine, Inc.*, — U.S. —, 104 S.Ct. 1473, 1479, 79 L.Ed.2d 790 (1984). We therefore are not prepared to hold that publication in the District of the letter of reprimand, which contained serious charges of unprofessional conduct, did not harm Reuber's reputation merely because he failed to establish a preexisting reputation in the District.

it requires that both the "act" and the injury occur in the District. Therefore, it would be playing word games with the statute to say the "act" occurs wherever the "injury" it causes takes place.

Reuber would have us construe the reach of section 13–423(a)(3) to extend to the outermost bounds allowed by due process. *See* Brief for Appellant, No. 83–1536, at 31. But even if the District of Columbia courts had construed this section so broadly,[13] we do not believe it would cover the acts of the individual defendants here, since Reuber has not shown a sufficient nexus between the specific tortious conduct alleged and the District for us to conclude that "the defendant[s'] conduct and connection with the forum state [the District] are such that [they] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). The record on appeal shows that the defendants disseminated the allegedly defamatory letter only to a narrow class of people in Maryland. The mere fact that this letter ultimately found its way to the Food Chemical News which published excerpts in the District, "is far too attenuated a contact to justify [the District's] exercise of *in personam* jurisdiction over [the defendants]." *World-Wide Volkswagen,* 444 U.S. at 299, 100 S.Ct. at 568.

■ Reuber presses two additional arguments as to why the district court had personal jurisdiction over the individual defendants under section 13–423(a)(3). First, he contends that the defendants acted as co-conspirators and therefore may be subject to personal jurisdiction based on acts of co-conspirators done within the District in furtherance of the conspiracy. *See Ber-*

*lin Democratic Club v. Rumsfeld,* 410 F.Supp. 144, 151 (D.D.C.1976); *Mandelkorn v. Patrick,* 359 F.Supp. 692 (D.D.C. 1973). This proposition, however, is entirely inapposite to this case since Reuber has not alleged a specific tortious act in the District by *any* of the alleged co-conspirators.[14] Thus, Reuber has not "allege[d] specific acts connecting [any of these] defendant[s] with the forum [*i.e.,* the District]." *Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 788 (D.C.Cir.1983) (quoting *Greenspun v. Del E. Webb, Corp.,* 634 F.2d 1204, 1208 n. 5 (9th Cir.1980), *cert. denied,* —— U.S. ——, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984)).

■ Second, Reuber adverts to a principle from tort law used in cases where causation is uncertain—that "where each of several defendants has acted wrongfully regarding a particular individual, but the plaintiff is unable to identify which of them actually caused him harm, the burden shifts to each defendant to prove, if he can, that he is not responsible." Brief for Appellant, No. 83–1536, at 38 (citing *Canterbury v. Spence,* 464 F.2d 772, 796 (D.C. Cir.), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972); *Bowman v. Redding & Co.,* 449 F.2d 956, 967 (D.C.Cir. 1971)). Reuber argues by analogy that since it is obvious that someone leaked the letter to Food Chemical News in the District, he should not have the burden of showing who did so. The principle upon which Reuber relies, however, applies only when it can be shown that no one other than the defendants caused the harm. *See Bowman,* 449 F.2d at 967; Restatement (Second) of Torts, § 433B(3) (1965). For this reason, even were we to accept the proffered analogy it would still not help

---

**13.** All the District of Columbia court decisions construing the long-arm statute as co-extensive with the due process clause have involved section 13–423(a), the "transacting ... business provision." *See Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.,* 647 F.2d 200, 204 n. 10 (D.C.Cir.1981). In *Mouzavires v. Baxter,* 434 A.2d 988, 991–92 (D.C.1981) (en banc), *cert. denied,* 455 U.S. 1006, 102 S.Ct. 1643, 71 L.Ed.2d 875 (1982), the District of Columbia Court of Appeals explicitly refused to

decide if the other provisions of the long-arm statute are co-extensive with the due process clause.

**14.** The district court dismissed this argument for insufficient evidence of the alleged conspiracy as well as for failure to identify any act within the District. *See Memorandum Opinion,* slip op. at 13.

Reuber. Here, we are by no means certain that it was one of the individual defendants who leaked the letter into the District. We thus agree with the district court that it did not have personal jurisdiction over the individual defendants under section 13–423(a)(3).

Reuber argues on appeal that, even if no act occurred in the District for purposes of section 13–423(a)(3), he was harmed in the District by defendants' acts outside it, and that the defendants have sufficient contacts with the District to subject them to the local court's jurisdiction under section 13–423(a)(4). The district court record, however, does not support this contention. Reuber's complaint makes no mention of any connection between the defendants and the District. *See* Complaint, ¶¶ 16–44 (filed Aug. 6, 1981). His opposition to defendants' first motion to dismiss on the grounds of no personal jurisdiction merely referred to allegations in the Complaint and asked for the opportunity to take discovery regarding defendants' actions in the District. *See* Combined Opposition by Plaintiff to Defendants' Motions to Dismiss or Alternatively for Summary Judgment 5, 7 (filed Oct. 7, 1981) [hereinafter cited as *First Opposition*]. In his opposition to defendants' second motion to dismiss, prepared after extensive discovery, Reuber's only allegation connecting the defendants to the District was that Hartwell engaged in a "substantial number" of telephone conversations with people in the District and that he received a letter from the EPA regard-ing a study by Reuber on the carcinogenicity of picloram. *See* Plaintiff's Statement of Genuine Issues in Support of Plaintiff's Combined Opposition to Defendant's Motion to Dismiss or Alternatively for Summary Judgment 13 (filed Aug. 16, 1982), *reprinted in* J.A. at 195 [hereinafter cited as *Second Opposition*]. There is no indication in the record, however, that Hartwell's telephone contacts with or receipt of mail from the District constituted the "persistent course of conduct" section 13–423(a)(4) requires.[15]

■ In his brief, Reuber recites several contacts each individual defendant had with the District. Brief for Appellant, No. 83–1536, at 42–45. We do not consider these alleged contacts, however, since Reuber failed to raise them in the district court either in his complaint or in his opposition to defendants' motions for dismissal for lack of personal jurisdiction. Nor need we consider Reuber's contention, first made in his reply brief to this court, that he has unveiled new evidence of a conversation Hartwell had in the District concerning the Reuber controversy. *See* Reply Brief for Appellant, No. 83–1536, at 4–8. Even where a dismissal is based on summary judgment, so that the reviewing court must view the record in the light most favorable to the appellant, any new evidence must be presented to the district court by a motion under Federal Rule of Civil Procedure 60(b) asking that court to reopen its final judgment.[16] *See National Anti-Hunger Coali-*

---

**15.** Reuber's only explicit mention of section 13–423(a)(4) before the district court was a citation to that section in his opposition to defendants' first motion to dismiss, *see First Opposition* at 5. He did not mention it in his opposition to defendant's second motion to dismiss, *see Second Opposition* at 85–89, and most significantly, he did not specifically argue *in either pleading* that any defendants engaged in a persistent course of conduct in the District.

**16.** [W]hile the District Court has no jurisdiction to grant relief while the case is pending on appeal [,t]his court has adopted the rule that [a Rule 60(b) ] motion for relief may be considered by the district court while the appeal is pending; if that court indicates it will grant relief the appellant should move in the appel-

late court for a remand in order that relief may be granted.

*Greater Boston Television Corp. v. F.C.C.,* 463 F.2d 268, 280 n. 22 (D.C.Cir.1971).

In this case, we also need not delve into the extent of our power to take judicial notice of the new evidence, *see Weisberg v. Department of Justice,* 705 F.2d 1344, 1345, 1361–62 (D.C.Cir. 1983), or to "remand for the District Court to consider the evidence, as part of our general power to remand for further proceedings 'as may be just under the circumstances,' 28 U.S.C. § 2106." *Id.* at 1361; *see also National Anti-Hunger Coalition v. Executive Committee of the President's Private Sector Survey on Cost Control,* 711 F.2d 1071, 1075 n. 4 (D.C.Cir.1983); *Carr v. District of Columbia,* 543 F.2d 917, 929 & n. 96 (D.C.Cir.1976). Even were we to consider

*tion v. Executive Committee of the President's Private Sector Survey on Cost Control,* 711 F.2d 1071, 1075 (D.C.Cir. 1983); *Weisberg v. Department of Justice,* 705 F.2d 1344, 1361–62 (D.C.Cir.1983).

■ The general rule is that the plaintiff has the burden of establishing personal jurisdiction. *See Naartex,* 722 F.2d at 787; *De Melo v. Toche Marine, Inc.,* 711 F.2d 1260, 1270–71 & n. 12 (5th Cir.1983). While we recognize that Reuber's claims were dismissed without an evidentiary hearing, and therefore that a court must "resol[ve] in ... favor of [the party asserting jurisdiction] all disputes concerning relevant facts presented in the record," *Nelson v. Park Industries, Inc.,* 717 F.2d 1120, 1123 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1277, 79 L.Ed.2d 682 (1984), here there is no evidence whatsoever in the record on appeal to suggest that Reuber met that burden. We thus affirm the district court's holding that Reuber failed to meet his burden of establishing the court's personal jurisdiction over the individual defendants.

### B. *Venue*

■ The district court held, as an alternative ground for dismissing Reuber's claims against the individual defendants, that venue for these claims was improper.[17] The applicable venue provision states:

> A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial dis-

trict where all defendants reside, or in which the claim arose ....

28 U.S.C. § 1391(b). All of the individual defendants reside in Maryland, hence venue in the District is proper only if Reuber's claims arose here.

In determining where the claim arose,[18] we must pay heed to the Supreme Court's admonition that absent "the unusual case in which it is not clear that the claim arose in only one specific district," there will be only one forum in which the plaintiff may bring suit against defendants who reside in different districts. *Leroy v. Great Western United Corp.,* 443 U.S. 173, 185, 99 S.Ct. 2710, 2717, 61 L.Ed.2d 464 (1979). The appropriate forum is that which is most convenient "in terms of availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but *not* of the plaintiff)." *Id.* Assessing these factors, we agree with the district court that the "claim arose" in Maryland and not in the District:

> All of the defendants reside in Maryland, as do most of the necessary witnesses. Any pertinent records are maintained at the FCRC and the NCI, both of which are located in Maryland. Finally, most, if not all, of the relevant actions comprising plaintiff's claims took place in Maryland, such as preparation of the letter, transference of the letter between individual defendants, other communications between the individaul [sic] defendants concerning disciplinary actions to be tak-

this new evidence as establishing personal jurisdiction over any of the defendants, we still would find persuasive the district court's alternative holding, *Memorandum Opinion,* slip op. at 7–10, that venue does not lie in the District of Columbia for Reuber's claims against the individual defendants. *See infra* text at notes 17–18.

**17.** Our determination that the district court did not have personal jurisdiction disposes of these claims. However, in light of our refusal to consider new evidence that may call that determination into question, *see supra* note 16, we believe our consideration of the alternative venue ground for dismissal may avoid needless consideration by the district court of any motion under Federal Rule of Civil Procedure 60(b).

**18.** The inquiry into where the "claim arose" under the general venue provision, 28 U.S.C. § 1391(b), is entirely different from that involving where the "acts or omissions occurred" under the venue provision governing FTCA claims, 28 U.S.C. § 1402(b). In amending section 1391(b) to allow suit where the claim arose, Congress rejected numerous proposals focusing on the sites of the events and acts underlying the claim. *See* 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure 25–27; Comment, *Federal Venue & Locating the Place Where the Claim Arose,* 54 Tex.L.Rev. 392, 398 (1976).

en against Dr. Reuber and investigations of Dr. Reuber's activities.

*Memorandum Opinion,* slip op. at 51.

Reuber contends that, although all the defendants, most of the witnesses, and most of the evidence are in the state of Maryland, they are in fact situated closer to the District of Columbia than to the United States courthouse in Baltimore, in which the United States District Court for the District of Maryland sits. In essence he argues that since the concern of section 1391(b)—the parties' convenience—is a "pragmatic" one, *see Lamont v. Haig,* 590 F.2d 1124, 1133 (D.C.Cir.1978), we should ignore state boundaries in determining where the claim arose. Despite the pragmatic concerns of section 1391(b), we believe that its language—allowing suit to be brought "in the judicial district where ... *the claim arose*"—mandates that we take account of the boundaries between such districts. Congress clearly did not intend to enmesh the courts in the business of measuring miles from various courthouses to the defendants' residences, the witnesses' residences, and the situs of the tortious act.

Reuber cites *Mundy v. Weinberger,* 554 F.Supp. 811, 817–18 (D.D.C.1982), where the court held that "the geographical placement of the Pentagon across the Potomac River from the bulk of the U.S. government's principal offices [did] not deprive [that] lawsuit ... of its solid grounding in the District of Columbia." *Id.* at 817. We do not read *Mundy* as advocating any general policy of bypassing judicial district boundaries. In *Mundy* the controlling allegation was that while the defendants may have made their decisions at the Pentagon, those decisions were aimed at the employment status of a single individual who worked in the District. It noted that "the plaintiff's grievance and the acts that gave rise to it [were] inextricably bound up with the District of Columbia ...." *Id.* at 818. That is not the case here, where the plaintiff lived and worked in Maryland. We thus find *Mundy* does not bolster Reuber's position that venue lies in the District despite the fact that his claims are all "solidly grounded" in Maryland.

## IV. CLAIMS AGAINST THE CORPORATE DEFENDANTS

Dr. Reuber also appeals the district court's dismissal of his constitutional and pendent state law claims against Litton and Bionetics. The district court appears to have dismissed Reuber's claims against Litton and Bionetics for lack of federal subject matter jurisdiction. Reuber's complaint, however, did allege the presence of federal question jurisdiction over these claims pursuant to 28 U.S.C. § 1331. A court may dismiss a complaint alleging a federal claim for lack of subject matter jurisdiction only when the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial or frivolous." *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946); *see also Hagans v. Lavine,* 415 U.S. 528, 537–38, 94 S.Ct. 1372, 1379–80, 39 L.Ed.2d 577 (1974) (under 28 U.S.C. § 1343, a claim may be dismissed for lack of subject-matter jurisdiction if it is "obviously frivolous" or if its "unsoundness so clearly results from the previous decisions ... as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.") (citations omitted).

Under this lenient standard, subject matter jurisdiction over Reuber's federal claims against Litton and Bionetics is clearly present. The complaint alleges that the corporate defendants were liable for the writing and dissemination of the letter of reprimand and the resultant "constructive discharge" of Reuber. The complaint further alleges that the individual corporate defendants were acting at the direction of, or in concert with, the individual NCI officials. Complaint, ¶¶ 29–38. Finally, the complaint alleges that these actions violated Reuber's first amendment rights of freedom of association, freedom of speech, and privacy as well as his fifth amendment right to procedural due pro-

cess. *Id.* ¶¶ 55–58. Although, as we shall discuss, these claims present the question whether a constitutional tort action to recover damages against private individuals or entities exists in the circumstances here, the claims are not clearly foreclosed by controlling precedent and therefore serve as a predicate for subject matter jurisdiction. The district court, thus, erred in dismissing Reuber's constitutional claims for lack of federal subject matter jurisdiction.

The remaining question for this court is whether Reuber's complaint states a claim upon which relief can be granted. Reuber's complaint states such a claim only if a constitutional tort action for damages can be brought against private individuals or entities when it is alleged that the private parties have engaged in state action. It is to this question that we now turn.

A. *Approach to Implication of Constitutional Damages Actions*

The history of constitutionally based actions for money damages begins with *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In *Bivens*, the Court ushered into our law the principle that citizens can bring an action to recover damages for fourth amendment violations from federal officers acting in their official capacity, notwithstanding the absence of a congressionally authorized cause of action. The Supreme

Court has extended this principle to plaintiffs seeking to bring actions under the fifth amendment, *see Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and the eighth amendment, *see Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). This court has implied constitutional damages actions for violations of the first amendment. *See Dellums v. Powell*, 566 F.2d 167, 195–96 (D.C.Cir.1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978).

▮ It is axiomatic that a *Bivens* action can be brought only against one who is engaged in governmental (or "state") action[19] or, to put the matter another way, who is acting under color of federal law. The principle underlying the requirement of "state action" is that individual " 'rights secured by the Constitution are protected only against infringement by governments.' " *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982) (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978)). Thus, it is clear that in order to prevail on his *Bivens* claim, Reuber would have to prove that officials at NCI and officers at Litton and Bionetics conspired to discipline him because of his exercise of first amendment rights.[20] We, of course, cannot resolve this

**19.** In a case alleging a *Bivens*-type claim, federal rather than state action must be alleged in order to sustain the complaint. The doctrine outlining both concepts is usually denominated as "state action," and the term will be used here to denote federal governmental action. *See Dobyns v. E-Systems, Inc.*, 667 F.2d 1219, 1220 n. 1 (5th Cir.1982).

**20.** Plaintiff relies on *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–52, 90 S.Ct. 1598, 1604–05, 26 L.Ed.2d 142 (1970) to support his claim that a conspiracy with a state official can give rise to state action. In that case, the Court held that the under-color-of-state-law requirement of 42 U.S.C. § 1983 could be satisfied if it could be demonstrated that the restaurant's employees, in the course of their employment, conspired with the sheriff to deprive the plaintiff of federal rights. The Supreme Court has recently affirmed that such a conspiracy can constitute state action. *Lugar v. Edmundson Oil Co.*, 457 U.S. 922, 941, 102 S.Ct. 2744, 2756, 73 L.Ed.2d

482 (1982). Both the Supreme Court and this court have noted that § 1983 actions often raise identical concerns with *Bivens* actions, and that the standard governing the two should be identical unless good reasons dictate otherwise. *See Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (immunity of federal officials from *Bivens* actions is coextensive with immunity of state officials from § 1983 actions); *Doe v. District of Columbia*, 697 F.2d 1115, 1123 (D.C.Cir.1983) ("assertion [in context of section 1983 action] that constitutional rights protect particular interests and are to be valued solely by reference to those interests is transferrable to the *Bivens* context"); *cf. Carlson*, 446 U.S. at 24 n. 11, 100 S.Ct. at 1474 n. 11 (state interest in having its procedural rules apply to § 1983 actions against its workers justifies different treatment of survivorship rules in § 1983 and *Bivens* actions). Of particular significance in this case, is the Supreme Court's observation that "constitutional injuries made actionable by section 1983 are of no greater magnitude than

issue here since, given the posture of this case, we must take all of plaintiff's factual allegations as true.

While we cannot resolve the fact-bound issue of whether state action was present in this case, we can address the purely legal question presented. The legal question, simply stated, is whether constitutional tort claims for damages can be brought only against federal officials or whether *Bivens*, by analogy to 42 U.S.C. § 1983, encompasses actions against private parties acting under color of federal law. The Supreme Court has never had occasion to address this issue. This circuit expressly left open the question whether *Bivens* liability might extend to private parties under certain circumstances in *Zerilli v. Evening News Association*, 628 F.2d 217 (D.C.Cir. 1980).[21]

In *Zerilli*, the plaintiffs alleged that the Department of Justice had, in the course of illegal electronic surveillance, transcribed certain communications between the plaintiffs and others. Ten to fifteen years later, officials at the Department of Justice released the material to the Evening News Association. This newspaper then published that information in a series of articles entitled "Organized Crime in Detroit." Plaintiffs alleged that the officials and the newspaper had conspired to violate their fourth amendment rights and thus sued both the officials and the newspaper under a *Bivens* constitutional tort theory.

After dismissing the claim against the federal officials on the ground that it was identical to a claim pending in a related case in the same court, the court turned to the *Bivens* claim against the newspaper. The court noted that although the Supreme Court had not addressed the issue of extending *Bivens* liability to reach private parties acting under the color of federal law, the Court had more generally indicated that *Bivens* liability is inappropriate " '[when defendants demonstrate] special factors counselling hesitation....' " *Zerilli*, 628 F.2d at 223 (quoting *Bivens*, 403 U.S. at 396, 91 S.Ct. at 2004). We then relied on this general exception to *Bivens* liability to dispose of the *Zerilli* case:

> Assuming without deciding that private parties may in some circumstances be held liable under *Bivens* for conspiring with federal officials, we believe there are three "special factors" that, taken together, preclude us from imposing such liability in the present case.

*Id.* (citations omitted). In other words, assuming a *Bivens* action did exist, the presence of special factors in the case made *Bivens* liability inappropriate.[22]

those for which federal officials may be responsible." *Butz*, 438 U.S. at 500, 98 S.Ct. at 2907. Starting from this proposition, it follows that constitutional violations by private parties acting in concert with state officials are of no greater magnitude than those by private parties acting in concert with federal officials. Thus, there is no reason to believe the private status of the defendants limits *Bivens* actions to any greater extent than it limits § 1983 actions.

**21.** At least two circuits have construed *Bivens* to encompass constitutional damages actions against private parties as long as there is state action. *See Dobyns v. E-Systems, Inc.,* 667 F.2d 1219 (5th Cir.1982); *Yiamouyiannis v. Chemical Abstracts Service,* 521 F.2d 1392 (6th Cir.1975). Dicta from two other circuits strongly suggests that they too would allow such actions. *See Writers Guild of America, West, Inc. v. American Broadcasting Co.,* 609 F.2d 355, 360 (9th Cir. 1979), *cert. denied,* 449 U.S. 824, 101 S.Ct. 85, 66 L.Ed.2d 27 (1980) (holding no liability only because primary jurisdiction to consider plaintiffs'

claims rested with the FCC); *Holodnak v. AVCO Corp., AVCO-Lycoming Division, Stratford,* 514 F.2d 285 (2d Cir.), *cert. denied,* 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975) (holding private party liable for unconstitutional dismissal of employee at government's behest because of "just cause" provision in employment contract). Only one circuit has stated that there is no cause of action against private parties acting under color of federal law. *See Fletcher v. Rhode Island Hospital Trust Bank,* 496 F.2d 927 (1st Cir.1974). The first circuit decided this issue in a footnote, in the context of a § 1983 action, with no articulated rationale.

**22.** The court relied on three special factors in the *Zerilli* case. First, the court held that "the asserted violation of constitutional policy that would form the predicate for such liability—i.e., the alleged government disclosure of information originally obtained in violation of the Fourth Amendment—is well removed from the central thrust of the amendment." 628 F.2d at 223. Second, as stated above, the court held

The *Zerilli* approach is the approach taken by *Bivens* and its progeny: the presence of special factors in a particular case may render an otherwise existing *Bivens*-type action inappropriate. A court, however, must start its inquiry into the propriety of a damages remedy from the proposition that "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Bivens*, 403 U.S. at 395, 91 S.Ct. at 2004. In *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), the Supreme Court stated:

> *Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the federal official in federal court despite the absence of any statute conferring such a right. Such a cause of action may be defeated in a particular case, however, in two situations. The first is when defendants demonstrate "special factors counselling hesitation in the absence of affirmative action by Congress." The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective.

*Id.* at 18–19, 100 S.Ct. at 1471 (emphasis in original) (citation omitted). *Carlson* makes it clear that in assessing any *Bivens* action, the court must permit such an action unless Congress has already provided an equally effective remedy to redress the constitutional wrongs or unless special factors exist which taken together make the *Bivens* action inappropriate.[23]

Whether Reuber has a *Bivens* action, in the first instance, depends on whether he has alleged circumstances sufficient to characterize the corporate defendants as federal actors. Given the posture of *Zerilli*, it was unnecessary to address the question of state action directly. Instead, this court recognized the private status of defendants as a special factor based on the Supreme Court's observation, in the context of an unlawful search and seizure, that "[a]n agent acting—albeit unconstitutionally—in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own." 628 F.2d at 224 (quoting *Bivens*, 403 U.S. at 392, 91 S.Ct. at 2002).[24] But we must also be cognizant that there are situations where because the private action is clearly backed up by the power, property and prestige of the government, its resultant harm approaches closely or even equals that of

---

that the defendant's private status was itself a factor "counselling hesitation." Finally, the court held that the values served by "a free and vigilant press" would be harmed by allowing the suit to go forward. *Id.* at 224.

The dissent misconstrues the *Zerilli* special factors approach as a second threshold inquiry. Plaintiff first must establish state action *and* second there must be an absence of special circumstances *before* a constitutional tort action will be presumed. The dissent appears to justify this reorientation and expansion of the special factors doctrine from an exception to a threshold inquiry by claiming that whereas *Bivens* actions are normally available against defendants who are federal actors, the present case involves non-governmental defendants. What the dissent fails to take cognizance of is that once state action is established the non-governmental defendants are deemed federal actors. *See infra* p. 1057. It is this misperception of the *Zerilli* special factors approach which leads the dissent to claim that *Zerilli* is being implicitly overturned. *See* Dissent at 1072. It is

not. As the ensuing discussion in the text illustrates, the approach taken here is entirely consistent with the approach taken in *Zerilli*. *See infra* notes 24 & 27.

**23.** There is no contention in this case that Congress has already provided an equally effective remedy to redress the constitutional wrongs of which Reuber complains. Special factors are addressed infra p. 1058.

**24.** Although *Zerilli* identifies the defendants' private status as a special factor, it is not clear to what extent, if any, this acknowledgment transcends the "state action" requirement in actions under 42 U.S.C. § 1983. *See Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). *See* discussion of relationship between state action requirement in § 1983 actions and *Bivens* actions, *supra* note 20.

government officials. *Cf. Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961) (state may be liable for discrimination by private party where state places its power, property and prestige behind the private conduct). "[W]hen authority derives in part from Government's thumb on the scales, the exercise of that power by private persons becomes closely akin, in some respects, to its exercise by Government itself." *Public Utilities Commission v. Pollak*, 343 U.S. 451, 462 n. 8, 72 S.Ct. 813, 820 n. 8, 96 L.Ed. 1068 (1952) (quoting *American Communications Association v. Douds*, 339 U.S. 382, 401, 70 S.Ct. 674, 685, 94 L.Ed. 925 (1950)). In *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), the Supreme Court stated:

> [W]e have consistently held that a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a "state actor" for purposes of the Fourteenth Amendment.

*Id.* at 941, 102 S.Ct. at 2756. Clearly once state action is established, the private party is deemed a state or, in this case, a federal actor.

The defendants here are not federal officials, nevertheless, the defendants may be deemed federal actors. The defendants' private status shield is lost when they act in such a way as to create an integrated alliance with the government and their conduct therefore is imbued with the power and prestige of government officials. The facts alleged here strongly suggest this is such a case.

 Taking Reuber's allegations as true, as we must at this juncture, the corporate defendants' alleged decision to punish Reuber for dissemination of his mala-

thion study sufficiently invoked the power and prestige of the National Cancer Institute so as to make the decision a governmental one in perception as well as reality. In this case, the government—according to Reuber's allegations—had heavy thumbs on the scale with respect to the disciplining of Reuber. Reuber alleges that the decision to take disciplinary action against him was initially made by NCI officials, who used the FCRC contract to pressure Bionetics into taking action. Thus, the disciplinary action was, in every sense of the phrase, government conduct, with predictably direct ramifications on the alleged injury done to Reuber. If the decision was made by NCI, presumably Reuber would be precluded from seeking work at other NCI facilities; the federal nexus thus directly extends the harm beyond the immediate relationship of Reuber to his employer. In addition, here the corporate defendants and the government derive the mutual benefits of Bionetics' operation of FCRC. FCRC is a government-owned facility operated by Bionetics. *See* Brief for Appellant, No. 82–2376, at 8. Bionetics' operations at FCRC are totally financially dependent on its government contract to operate that facility. All publications generated by this facility must state that the work on which they are based was performed pursuant to Bionetics' contract with NCI. It is clear, then, that Bionetics derives the prestige of association with the federal government with respect to its work at FCRC.

Given this scenario, Reuber has alleged circumstances sufficient, if proven, to characterize the corporate defendants as federal actors and thus has stated a cause of action against these private parties under *Bivens*.[25] *See Yiamouyiannis v. Chemical Abstracts Service*, 521 F.2d 1392 (6th Cir.1975) (holding that plaintiff-scientist's

---

**25.** Judge Bork in his concurring opinion notes that the corporate defendants "as ad hoc federal agents [are] entitled to invoke official immunity as a defense." Officials sued under a *Bivens*-type action have available a qualified immunity defense. *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Dellums v. Powell*, 566 F.2d 167 (D.C.Cir.1977), *cert. denied*,

438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978). Qualified immunity is an affirmative defense based on the good faith and reasonableness of the actions taken and the burden of proof is on the defendant officials. On remand, this defense would be available to the corporate defendants in the present action.

complaint that he was harassed, defamed and constructively discharged for publicly expressing views contrary to those of HEW stated a cause of action against his private employer under *Bivens*).[26]

### B. *Special Factors Analysis*

 As noted earlier, the presence of special factors in a particular case may indicate that *Bivens* liability is inappropriate. *See supra* p. 1056. The only special factor arguably relevant to the appropriateness of a *Bivens* remedy in the present case is the private status of the defendants. However, the private status of the defendants, even if deemed a special factor, is not alone sufficient to counsel hesitation in implying a damages remedy when the private party defendants jointly participate with the government to a sufficient extent to be characterized as federal actors for purposes of a *Bivens* action. Certainly, *Zerilli* does not suggest that the defendants' private status, *standing alone,* should suffice to deny plaintiffs a *Bivens* action.[27]

The dissent attaches special significance to the fact that the action here involves a corporate employer taking disciplinary action against one of its employees. Neither the substance nor the merits of the defendants' allegations against Reuber included in the March 1981 letter of reprimand are pertinent to our inquiry. Nor does the mere fact that this is an employment setting counsel judicial restraint. In *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), the Supreme Court held that where a federal employee's first amendment claims were fully cognizable under an elaborate, comprehensive, remedial scheme created by Congress, it would be inappropriate to supplement that scheme with a *Bivens* remedy. *Bush* squarely addressed a question of federal personnel pol-

icy and the court deferred to Congress' interest and expertise in "balancing governmental efficiency and the rights of [government] employees...." *Bush v. Lucas,* 103 S.Ct. at 2417.

Reuber is making a first amendment challenge to a personnel action taken by private employers. The critical factor, as the dissent notes, is that the private employers are government contractors. It is this relationship and the joint participation of the government and the private employers in the challenged action that makes Reuber's first amendment claim cognizable in the first instance. This type of alleged collusion between government and private employers to violate an employee's constitutional rights, which allows the government to accomplish indirectly that which it cannot do directly, is hardly a factor counselling hesitation in the absence of congressional action. Reuber, unlike the plaintiff in *Bush,* has no other avenue open to him for pursuing his first amendment claim against the corporate defendants.

The dissent's position that Congress' failure to regulate the personnel policies of government contractors, in light of its activity in other areas of the contracting relationship, makes judicial action inappropriate is not persuasive. First, this creates a door which closes both ways: Both congressional action in the relevant area as well as inaction become sufficient to defeat a *Bivens* remedy. Second, the dissent offers no support for the notion that Congress' inaction is indicative of its intent to preclude a *Bivens* remedy under the circumstances of this case. The situation is entirely different than the one in *Bush v. Lucas* where Congress had directly addressed the precise issue, weighed the competing policy concerns and provided a reme-

---

**26.** *Yiamouyiannis v. Chemical Abstracts Service,* 521 F.2d 1392 (6th Cir.1975) is cited for the general proposition that constitutional damages actions are available against private parties as long as state action is established. Whether the particular plaintiff in *Yiamouyiannis* was able to meet the state action requirement on remand is irrelevant for our purposes.

**27.** Although we identified the private status of the defendant as a special factor counselling hesitation in *Zerilli,* we relied on three special factors *taken together* to affirm the district court's dismissal of the plaintiff's complaint. *See Zerilli,* 628 F.2d at 223 ("[w]e believe there are three 'special factors' that, *taken together,* preclude us from imposing such liability in the present case.") (emphasis added).

dial scheme. *Bush v. Lucas, supra,* 103 S.Ct. at 2414–15. Whereas Congress would be reasonably expected to regulate federal personnel policy, it does not follow that Congress would be expected to attempt to comprehensively regulate the personnel policies of numerous private employers in varied fields who receive government contracts to varying extents. The fact that the defendants are government contractors should not preclude the court from providing a remedy in this case.

The dissent also argues that *Zerilli* indicates that the defendants' first amendment rights should be considered as a special factor counselling hesitation.[28] The only potential way the defendants' first amendment rights can be implicated in this case is by asserting that the defendants' exercise of their right to issue a corporate communication relating to the conduct of an employee might be chilled. This seems far-fetched, at best. More importantly, however, such an argument ignores the essential nature of Reuber's complaint. Reuber's constitutional complaint, in short, does not rely mainly on the publication of the reprimand letter, but rather on its issuance as a means to punish him for his own published study.[29] There is no question that the government and the corporate defendants, disagreeing with the conclusions or methodology of Reuber's study, were free to publicly state their position. But issuing a letter of reprimand, based on that disagreement, is quite a different matter. It is not a public statement of the

defendants' position; rather it is a punitive action by an employer against an employee. If, as alleged, the government and the corporate defendants conspired to punish Reuber because they objected to the contents of his malathion study, their conduct would not only be unprotected, but would itself be prohibited by the first amendment.

On remand, the district court should inquire whether the content of Reuber's study was a factor in the government's and defendants' joint decision to penalize Reuber. If it was, the burden would then shift to the defendants to show that, even absent the improper motive, the punitive action taken against Reuber would have occurred anyway. *See Mount Healthy City School Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). This approach is commended by Supreme Court precedent and such an inquiry is not likely in any way to discourage communication of the defendants' views on the results or quality of Reuber's study.

Finally, the dissent purports to rely on Supreme Court precedent for its third "special factor," the existence of an alternative defamation claim in the state courts. *See* dissent at 1074 (citing *Bush,* 103 S.Ct. 2404 and *Davis,* 442 U.S. at 245, 99 S.Ct. at 2277). The Supreme Court has indicated, however, that an alternative remedy may justify a court's refusal to imply a *Bivens* action only where "Congress meant to pre-

**28.** In *Zerilli,* the defendant was a newspaper and this court held that the values served by "a free and vigilant press" would be harmed by allowing a *Bivens* remedy. 628 F.2d at 224.

**29.** Reuber's complaint alleges acts other than the publication of the letter of reprimand:

26. On or about February 1981, defendant Hartwell learned that plaintiff's studies of malathion and picloram were being cited and used by certain opponents of the wide spread use of those chemicals, and that this use [of Reuber's studies] apparently dissatisfied the chemical companies and other interests which took a contrary position. Thereafter, defendant Hartwell initiated certain actions against plaintiff, and made various unfounded allegations against him, in an effort to ruin him professionally and cause him great mental

anguish. Defendant Hartwell was joined in these efforts by defendants DeVita, Hanna, and Adamson, among others.

. . . .

30. The defendants purported to conduct an "investigation" of certain unspecified "allegations" against plaintiff. During the course of this purported "investigation," plaintiff was not given adequate notice of the asserted "allegations" against him, was not allowed to confront any alleged witnesses against him, was not allowed to cross-examine anyone, was not allowed to present witnesses and evidence on his own behalf, and was not given the opportunity for a decision by an impartial decision-maker.

Complaint at 8, 9.

empt a *Bivens* remedy or to create · an equally effective remedy for constitutional violations." *Carlson,* 446 U.S. at 19, 100 S.Ct. at 1472. Carlson rejected the availability of an FTCA action as a reason to preclude a *Bivens* action under this test even though the FTCA provided an alternative federal action for the precise conduct attacked in the constitutional tort action before it. Furthermore, in *Bush,* which dismissed a money damages action under the special factors doctrine, Justice Marshall noted, "nothing ... foreclose[s] a federal employee from pursuing a *Bivens* remedy where his injury is not attributable to personnel actions which may be remedied under the federal statutory [civil service] scheme." *Bush,* 103 S.Ct. at 2418 (Marshall, J., concurring). This court later adopted Justice Marshall's position in holding that the district court must consider a civil servant's *Bivens* claims arising from conduct not administratively remediable by the Merit Systems Protection Board. *See Bartel v. Federal Aviation Administration,* 725 F.2d 1403, 1415 & n. 21 (D.C.Cir. 1984); *see also Williams v. I.R.S.,* 745 F.2d 702 at 705 (D.C.Cir.1984).

 Moreover, it is clear that Reuber's defamation action should not be a special factor in this case since it is not a substitute to redress the constitutional wrongs

that he alleges. The dissent seriously mischaracterizes Reuber's constitutional claims to justify its conclusion that "Reuber be directed to [the] well articulated body of [defamation] law rather than to require this court to create a novel and probably superfluous cause of action."[30] *See* Dissent at 1074. Reuber's constitutional claims focus on neither the truth of the allegations in the letter of reprimand nor the publication of that letter, the relevant issues in any defamation action.[31] They focus rather on whether the letter was sent in retaliation for the dissemination of his malathion study.[32]

Reliance on an alternative *state law* action to justify dismissal of Reuber's *Bivens* claim may also be improper. The Supreme Court has held, in a suit against federal prison officials, that survival of a decedent-plaintiff's *Bivens* action cannot be governed by state law. *Carlson,* 446 U.S. at 23–24, 100 S.Ct. at 1474. The Court stated that to ensure adequate redress of constitutional deprivations and deterrence of future violations "[a] federal official contemplating unconstitutional conduct ... must be prepared to face the prospect of a *Bivens* action." *Id.* at 25, 100 S.Ct. at 1475. It therefore refused to allow state law standards to limit the scope of actionable wrongs under the Constitution. Nonetheless, the dissent, without mentioning *Carl-*

30. An action for damages resulting from unlawful dismissal and other employment harassment in retaliation for. an employee's protected expression or beliefs is hardly "novel." The Supreme Court has recognized that such a claim may be asserted directly under the Constitution in what was essentially a *Bivens* action. *See Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471.(1977). It has also recognized such claims arising in different jurisdictional contexts on numerous occasions. *See, e.g., Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Other federal courts have also recognized *Bivens* actions in situations remarkably similar to that at issue here. *See, e.g., Yiamouyiannis v. Chemical Abstracts Service,* 521 F.2d 1392 (6th Cir.1975) (recognizing *Bivens* action against private defendant acting under color of federal law where plaintiff-scientist alleged defendant coerced him

to resign because of his expression of views contrary to those of the Department of Health, Education and Welfare).

31. To succeed in his defamation action, Reuber will have to show that the statements in the letter are false and were negligently made, and if Reuber is determined to be a public figure, he will have to show in addition that the defendants acted with reckless disregard as to the truth of those statements. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

32. The dissent appears to acknowledge this problem, but slides past it. Because Reuber might have some difficulty in proving damages from a denial of due process if the letter of reprimand were true it concludes he should not be allowed the opportunity to try. *See* Dissent at n. 12. With regard to Reuber's first amendment claim, the truth of the letter has no bearing on Reuber's ability to prove damages.

*son,* asserts that "the fact that the source of the alternative remedy is state law [does not] preclude ... us from treating it as a factor militating against the creation of a new cause of action against *private parties.*"[33] Dissent at 1074 (emphasis in original).

### C. *Reuber's Claims for Injunctive Relief*

In addition to seeking damages, Reuber's complaint asks the court for an injunction ordering the defendants to stop interfering with Reuber's exercise of his constitutional rights, expunge or correct false or inaccurate documents relating to Reuber, and reinstate Reuber to his former position at the Frederick Cancer Research Center. *Complaint* at 20–21. Federal injunctive relief traditionally is presumed available against federal actors committing constitutional violations.[34] This is true regardless of whether or not the plaintiff may also have a *Bivens* action for damages. *See Bartel v. Federal Aviation Administration,* 725 F.2d 1403, 1415 (D.C.Cir. 1984) (remanding claims for injunctive relief based on alleged due process violation where special factors doctrine justified dismissal of damages claim). Justice Harlan, concurring in *Bivens,* noted that there already existed a "presumed availability of federal equitable relief against threatened invasions of constitutional interests," under Congress' general grant of subject matter jurisdiction for cases arising under the federal constitution. *Bivens,* 430 U.S. at 404, 91 S.Ct. at 2008 (Harlan, J., concurring). On numerous occasions prior to *Bivens,* the Supreme Court had permitted suits for injunctive relief brought directly under the constitution for violations of plaintiffs' constitutional rights. *See, e.g., Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Philadelphia Co. v. Stimson,* 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570 (1912); *see also Bell v. Hood,* 327 U.S. 678, 684 & n. 4, 66 S.Ct. 773, 777 & n. 4, 90 L.Ed. 939 (1946). Thus, recognizing that Reuber has alleged violations of his constitutional rights, we remand his prayer for injunctive relief to the district court for decision on the merits of his claims and for appropriate equitable relief if they are proven.

The extent of equitable relief appropriate in this case is not clear at this juncture. In my opinion, the propriety of particular forms of equitable relief should be determined by the district court "according to the distinctive historical traditions of equity as an institution." *Bivens,* 403 U.S. at 404, 91 S.Ct. at 2009 (Harlan, J., concurring); *see also Holmberg v. Armbrecht,* 327 U.S. 392, 395–96, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946) (applying traditional equity test for injunctive relief from denials of federal statutory rights); *Sprague v. Ticonic National Bank,* 307 U.S. 161, 165–66, 59 S.Ct. 777, 779–80, 83 L.Ed. 1184 (1939) (same).

**33.** The dissent suggests that the Supreme Court's consideration of alternative state remedies in *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), supports its invocation of such remedies as a special factor in this case. *See* Dissent at n. 12. The relevant inquiry in *Ingraham,* however, focused on whether the state denied the plaintiff due process, *i.e.,* violated the plaintiff's constitutional rights in the first place. Once the dissent concedes Reuber alleges a deprivation of his constitutional rights, *Ingraham's* consideration of alternative state remedies becomes irrelevant. It is irrelevant, in any case, to Reuber's first amendment claim. *See Paul v. Davis,* 424 U.S. 693, 710 n. 5, 96 S.Ct. 1155, 1165 n. 5, 47 L.Ed.2d 405 (1976) (for "interests ... guaranteed in one of the provisions of the Bill of Rights, ... 'incorporated' into the Fourteenth Amendment .... [s]ection 1983 makes a deprivation of such rights actionable independent of state law").

The dissent's suggestion that the existence of a defamation action means that Reuber's due process rights were not violated in this case is not persuasive. While post-deprivation procedures provided by state law may bear on whether *that state* provides all the process due the deprived party, it does not follow that a state's remedial scheme is relevant as to whether *the federal government* has provided all the process the deprived party is due. The illogic of the argument is compounded in this case, because the alternative state action on which the majority relies does not even pretend to redress the unconstitutional deprivation of which Reuber complains. *See* text at notes 31 & 32, *supra.*

**34.** As discussed *supra* at 31, the corporate defendants are properly characterized as federal actors once state action is established.

Judge Starr believes that any form of injunctive relief is inappropriate. Judge Bork, however, concludes that a prohibitory injunction, reinstatement, and expungement of records are available. Consequently, on remand, equitable relief in the form of an injunction against future interference with Reuber's exercise of his constitutional rights, reinstatement, or expungement of personnel records may be granted.

 In sum, we reverse the district court's dismissal of Reuber's constitutional claims against the corporate defendants for both damages and equitable relief. These claims are remanded to the district court for further proceedings consistent with this opinion.[35] We also reverse the district court's dismissal of Reuber's pendent state law claims. This court is generally reluctant to overturn, as an abuse of discretion, the district court's dismissal of pendent state law claims. In the present case, however, the district court dismissed the pendent state claims under the erroneous belief that there was no federal subject matter jurisdiction to hear the federal claims. Thus, in light of our disposition of the federal claims, it is necessary to remand to the district court, for further consideration, the issue of whether pendent jurisdiction lies for Reuber's state law claims.

**35.** The Litton corporate defendants argue that the district court dismissed Reuber's constitutional tort claims because Reuber failed to specifically allege constitutional claims against Litton and Bionetics in his complaint. *See* Brief for Litton Appellees, No. 82–2376, at 15–16. In our reading, however, the district court's opinion recognizes that Reuber's complaint alleges constitutional claims against the corporate defendants but dismisses the claims for lack of subject matter jurisdiction. *See supra* p. 1053.

The corporate defendants also argue that the district court's dismissal should be upheld on the ground that Litton and Bionetics cannot be held liable for the constitutional torts of their employees solely on a *respondeat superior* theory. *See Monell v. Dep't of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Doe v. District of Columbia,* 697 F.2d 1115, 1121 (D.C.Cir.1983); *Tarpley v. Greene,* 684 F.2d 1, 9–11 (D.C.Cir.1982). We note that we may affirm the district court's dismissal on an alternate ground. *See Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156, 25 L.Ed.2d 491 (1970); *Boykin v. District of Columbia,* 689 F.2d 1092, 1099 (D.C.Cir.1982); *United States v. General Motors Corp.,* 518 F.2d 420, 441 (D.C.Cir.1975). Given the particular circumstances of this case, however, we decline to decide this issue at this juncture.

A facial reading of Reuber's complaint may warrant the conclusion that he has alleged only vicarious liability on the part of the corporate defendants, thus making summary judgment appropriate. On the other hand, in light of our present holding that *Bivens* liability may extend to the corporate defendants in this case, there are sufficient allegations in the complaint to warrant the conclusion that Reuber could state a cause of action under *Monell* and its progeny if given leave to amend his complaint pursuant to Fed.R.Civ.P. 15(a). *See Monell,* 436 U.S. at 690 (Local governing bodies can be held liable where the alleged unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."); *Goss v. San Jacinto Junior College,* 588 F.2d 96, 98 (5th Cir.1979) (College liable for acts of President "whose edicts or acts may fairly be said to represent official policy."); *Standridge v. City of Seaside,* 545 F.Supp. 1195, 1199 (N.D.Cal.1982) (Liability of city may be established by showing "conduct by officials in authority evincing implicit authorization or approval or acquiescence in the unconstitutional conduct."). Reuber clearly expressed in his brief a desire to amend his complaint if it is deemed insufficient. Brief for Appellant, No. 82–2376, at 29 n. 12. Indeed, judging from the district court's docket sheet, it appears that the corporate defendants never filed answers to the complaint—instead moving to dismiss or in the alternative for summary judgment. It is settled law that neither a motion to dismiss nor a motion for summary judgment is a responsive pleading within the meaning of Rule 15 of the Federal Rules of Civil Procedure. *See, e.g., Barksdale v. King,* 699 F.2d 744 (5th Cir.1983); *McDonald v. Hall,* 579 F.2d 120 (1st Cir.1978). Hence, Reuber would be entitled as of right under Rule 15 to amend his complaint, if indeed no responsive pleading was ever entered. Even if a responsive pleading was entered, of course, Rule 15 provides that the court may give leave to amend the complaint, and that decision can properly be confided to the sound discretion of the district court on remand. The district court, on remand, will also be in a better position than this court to determine whether Reuber is collaterally estopped from relitigating any of the factual issues in the present case as a result of the district court's disposition of his Privacy Act claims. *See supra* n. 1.

## V. CONCLUSION

In conclusion, we affirm the district court's dismissal of the FTCA actions against the United States and the constitutional and common law tort claims against the individual defendants. For the reasons stated in Part IV, we reverse the district court's dismissal of the constitutional and pendent state law claims against the two corporate defendants Litton Industries, Inc., and Litton Bionetics, Inc. We remand these claims to the district court for further proceedings consistent with this opinion.

*Judgment accordingly.*

BORK, Circuit Judge, concurring:

I concur in Judge Wald's result and in her opinion with the exception of Part IV, addressing appellant's federal common law claims against the Litton corporate defendants. These claims are based on appellant Reuber's allegations that federal officials, in retaliation for his exercise of freedom of speech, induced his private, corporate employer to take disciplinary action against him that led to his "constructive discharge." The questions for decision are whether a *Bivens* action and actions for several kinds of equitable relief, including reinstatement, will lie against Reuber's employer insofar as its disciplinary actions and their alleged effects are state action. I agree with Judge Wald that both damages and equitable relief are available in this case, but reach this result on narrower grounds, and for different reasons.

### I.

Judge Starr argues that three "special factors" make it undesirable to imply a *Bivens* action here. These are, first, the private status of the defendants, which Judge Starr takes to imply that they do not enjoy official immunity; second, the fact that Reuber's expression of his views concerned the subject-matter of his employer's business; and, finally, the availability of a state-law defamation remedy. I agree with Judge Starr that we can consider a broad range of factors in deciding whether to imply a constitutional tort in novel circumstances. In my view, however, the first of these factors is absent here: a private person whose conduct is allegedly instigated and directed by federal officers should be treated as a federal agent. Like any other federal agent, the private person should

under these circumstances be subject to *Bivens* liability and entitled to qualified official immunity. The remaining factors set forth by Judge Starr are not weighty enough to justify refusing to allow a *Bivens* action here—especially since official immunity is available.

This case falls within a subcategory of "state action" cases in which, in addition to making allegations that satisfy the state action requirement, the plaintiff alleges that the private person acted as an agent, formal or informal, of federal officers. Just as this is the strongest type of case for extending official immunity, it is the strongest for applying the *Bivens* doctrine. I need not and do not decide that a *Bivens* action should be available whenever the state action requirement is met as to a private person whose conduct, for that reason, becomes subject to constitutional constraints. But where federal officials are not only fairly responsible but *primarily* responsible for a constitutional violation, the scope of a *Bivens* action—and of official immunity—should not turn on the fortuity of whether the damage was actually done by a federal official or by a private person acting pursuant to the exertion of official power. *Cf. Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982) (state action doctrine requires only that "the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State").

The case-law, though sparse, clearly supports the appellees' status as ad hoc federal agents entitled to invoke official immunity as a defense. In *Becker v. Philco Corp.*, 372 F.2d 771 (4th Cir.), *cert. denied*, 389 U.S. 979, 88 S.Ct. 408, 19 L.Ed.2d 473 (1967), plaintiffs sued their employer, Philco Corporation, for allegedly defaming them in a security clearance report to the federal government. Philco was required by its defense contracts to investigate possible breaches of security and report its findings to the government. The Fourth Circuit held that because the company was in effect an agency of the government, charged with maintaining secrets affecting national security, "the company and its trusted personnel were imbued with the official's character, and partake of his immunity to liability, whenever and wherever he would enjoy the absolute privilege." 372 F.2d at 774. On similar facts, district courts have reached the same conclusion in

*Logiurato v. Action,* 490 F.Supp. 84, 91 (D.D.C.1980) (extending qualified immunity for constitutional violations to medical examiners who acted under Peace Corps direction and control), and in *Blum v. Campbell,* 355 F.Supp. 1220 (D.Md.1972) (housing project managers acting under the direct supervision and control of the FHA were absolutely immune from state-law defamation claims). Moreover, the district court in the present case noted its conclusion that the corporate defendants would enjoy official immunity, though it did not need to reach that question since it held there was no federal subject-matter jurisdiction as to those defendants. J.A. at 55 n. 2.

Appellant contends that these authorities are invalid after *Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), in which the Supreme Court refused to extend absolute judicial immunity in a section 1983 case to a judge's private co-conspirators. *Dennis* is easily distinguishable, however, because in that case it was alleged that the private defendants had bribed the judge to induce him to enter an injunction depriving the plaintiffs of property without due process of law. 449 U.S. at 26, 28, 101 S.Ct. at 185, 186. The private defendants were not enlisted by the state to assist in performing its functions but knowingly induced the misuse of state power. Here, by contrast, the chain of causation runs the other way: Reuber alleges that it is the federal officials who induced the corporate defendants to discipline Reuber in retaliation for speech protected against state action by the first amendment. *Dennis* simply means that there are some situations in which a private actor's conduct can constitute state action without simultaneously constituting the conduct of an agent of the state. This is not one of those situations.[1]

This analysis also explains why the *Zerilli* court's recognition of private status as a special factor weighing against implying a *Bivens* action is inapposite here. In *Zerilli,* the plaintiff sought to bring a *Bivens* action against a newspaper that had published the contents of communications by the plaintiff allegedly obtained by the federal government in violation of the fourth amendment. Although plaintiff apparently alleged a conspiracy, *see* 628 F.2d at 218, it is clear that only the government had the power to disclose that information to the newspaper. Thus, whatever assistance or encouragement the newspaper may have provided seems distinctly secondary to the government's actions in obtaining and later disclosing the communications. The *Zerilli* court's assertion that "a defendant's private status" was a special factor counselling against implication of a *Bivens* remedy, *id.* at 223–24, should be construed in light of those facts, which would have precluded the newspaper from asserting official immunity. Indeed, the *Zerilli* court gave as the reason for its assertion the fact that "the primary purpose of the *Bivens* doctrine is to remedy abuses by *those who act as agents for the sovereign." Id.* at 224 (emphasis added). The concept of "agency," for purposes of constitutional tort law, is broad enough to include conspiracies such as the one alleged in the present case, though not conspiracies such as the one alleged in *Zerilli.*

The first of the special factors on which Judge Starr relies—the defendant's status as a private party—is accordingly inapplicable here. Judge Starr suggests that the fact that Reuber's expression also was directed to the business operations of his employer and the availability of a state-law defamation remedy also counsel hesitation in allowing a *Bivens* action to go forward here. Once it is established that the defendants are ad hoc federal agents who are immune from damages liability so long as they acted in good faith, however, these

---

1. There is every reason to extend official immunity—which in the constitutional context means good-faith immunity—to private actors for whose conduct federal government officials are primarily responsible. Official immunity exists to "protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978). On innumerable occasions, the exercise of official discretion in the public interest requires the active cooperation of private persons. Whether that cooperation is compelled by contract, as in

*Philco,* by legal duty, as when a policeman demands help in making an arrest, or by the government's bargaining power in the context of a mutually advantageous relationship, as seems to be alleged in the present case, the private person who cooperates ought not be deterred from doing so by the prospect of liability without regard to whether he has acted in good faith. Indeed, there may well be circumstances in which the state officer will prove not to be immune, yet the private "co-conspirator" will be able to show that he relied on the official's authority in good faith.

reasons lose much of their force. To the extent that Reuber's criticisms concern his employer's business judgment and integrity, for example, the employer may be able to show that it punished Reuber in the good-faith belief that his disloyalty entitled it to do so. On the other hand, Reuber alleges that he was punished because his remarks were critical of the federal government, and that is precisely the kind of speech the first amendment was designed to protect. Nor, as Judge Wald shows, is the defamation remedy an effective substitute for those aspects of Reuber's constitutional claim that relate to his "constructive discharge." Though an employer's relations with his employees are indeed an area in which we should be slow to intrude, that consideration alone does not support denial of compensatory damages to a person aggrieved by the unconstitutional conduct of an employer acting under the direction of federal officers.

## II.

In addition to damages, Reuber has requested injunctive relief directing the corporate defendants to refrain from any future interference with his constitutional rights, to reinstate him to his former position, and to expunge any false or inaccurate records concerning him. Only the first of these requests is squarely governed by the "presumed availability of federal equitable relief against *threatened invasions* of constitutional interests," *Bivens*, 403 U.S. at 404, 91 S.Ct. at 2008 (Harlan, J., concurring) (emphasis added), on which Judge Wald relies. The request for reinstatement is a request for relief from harms already accomplished and inherently unlikely to be repeated, and the request for expungement can be viewed as both corrective of past harm and preventive of threatened future harm. Consequently, although I agree with Judge Wald that the district court has power to enjoin the corporate defendants from future interference with Reuber's constitutional rights if it finds that the prerequisites to awarding injunctive relief have been met, the case for allowing the claims for reinstatement and expungement to go forward is much closer.

Reuber's constitutional claim, if proved, entitles him to relief unless official immunity is successfully interposed as a defense [2]—but it does not follow that relief should be by way of reinstatement rather than damages. For, if damages are an adequate remedy at law, equitable relief such as reinstatement would not be available in federal court. *E.g., O'Shea v. Littleton*, 414 U.S. 488, 499, 502, 94 S.Ct. 669, 677, 679, 38 L.Ed.2d 674 (1974). Nor is it true, as Judge Wald seems to think, that this decision must be left to the district court. Of course, "in shaping equity decrees, the trial court is vested with broad discretionary power." *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973). However, the prerequisites to the granting of equitable relief, such as the absence of an adequate remedy at law, involve an inquiry that is primarily jurisprudential rather than evidentiary. An objection to injunctive relief on grounds that there is an adequate remedy at law "does not go to the jurisdiction of

---

**2.** The same reasons that support extending official immunity to the corporate defendants as to damages support allowing qualified official immunity as a bar to reinstatement. There is a threshold difficulty, however: the limits on injunctive relief against state or federal officers ordinarily derive from *sovereign* immunity, not official immunity. *See, e.g., Butz v. Economou*, 438 U.S. 478, 523, 98 S.Ct. 2894, 2919, 57 L.Ed.2d 895 (1978) (Rehnquist, J., concurring in part and dissenting in part) (conceding that equitable relief by way of mandamus or injunction is generally available against government officials, and arguing that for that very reason government officials should enjoy absolute rather than qualified immunity from damages liability); *cf. Pulliam v. Allen*, —— U.S. ——, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984) (holding that absolute judicial immunity does not bar prospective injunctive relief under § 1983 against a state-court judge acting in a judicial capacity). Of course, the reason why government officials cannot assert qualified official immunity as a defense to injunctive relief is that they normally are not personally liable for the costs of complying with an affirmative injunctive decree. *See Rowley v. McMillan*, 502 F.2d 1326 (4th Cir. 1974) (official immunity doctrine has no application to suits for injunctive relief, at least so long as they do not have the inhibitory effect of suits for money damages). Here, by contrast, the corporate defendants would bear the costs of reinstatement, and it seems clear that the inhibitory effect would be at least as great as the effect of an award of damages. Moreover, to authorize reinstatement but refuse to allow official immunity as a defense to that remedy could produce topsy-turvy results: the federal officials primarily responsible for the wrong would be held harmless if they acted in good faith, while the private employer, acting in equally good faith, would be subject to a most intrusive remedy.

the court as a federal court and may be waived and not considered if not timely raised." *Petroleum Exploration, Inc. v. Public Service Commission,* 304 U.S. 209, 216 n. 7, 58 S.Ct. 834, 838 n. 7, 82 L.Ed. 1294 (1938). Yet, "if it be obvious that there is an adequate remedy at law, the court acts *sua sponte* to preserve the courts of equity as a forum for extraordinary relief ...." [3] *Id.* Especially in view of the unusual extent to which Reuber's constitutional claims involve non-governmental entities and interests,[4] it is appropriate for us to make the determination as to the existence of an adequate remedy at law ourselves.

Given that damages are available, a compelling argument can be made that reinstatement as an equitable remedy is foreclosed, because damages are an adequate remedy as a matter of law. The loss of employment is not a loss that is inherently immeasurable or noncompensable in monetary terms—such losses are routinely measured and compensated in a variety of legal contexts. Similarly, the fact that Congress has made reinstatement available against private employers in furtherance of federal labor and employment discrimination policy, *see* 29 U.S.C. § 160(c) (1982) (NLRB may order reinstatement as remedy for unfair labor practice); 42 U.S.C. § 2000e–5(g) (1982) (court may order reinstatement as remedy for employment discrimination), suggests less that damages are inadequate to compensate victims than that reinstatement is necessary to prevent employers from "buying back" rights Congress has conferred on employees in furtherance of a broad federal policy. Furthermore, because by definition a request for reinstatement presupposes that the harm to the plaintiff has already occurred, this class of cases does not entail the risk that a too-ready application of the inadequacy prerequisite would permit a threatened violation of a constitutional right to go forward, to the irreparable detriment of the plaintiff. At least in cases such as this one, in which it is alleged that the government induced the conduct that harmed the plaintiff, there seems little hazard to enforcement of federal constitutional rights in adhering to the traditional understanding that damages are an adequate remedy for loss of employment.

These considerations gain added force when it is recalled that reinstatement is the equivalent of specific performance of a contract for personal services. The common law traditionally disfavored specific performance of such contracts precisely to avoid the friction and the social costs that may result when employer and employee are forcibly reunited in a relationship that has already failed. Reinstatement is, even today, not the ordinary remedy for breach of an employment contract at state law. *See Restatement (Second) of Contracts* § 367 (1979).[5] Indeed, "the presence of an adequate remedy at law is often given as a specific reason for denying specific performance of a contract for services, and the general rule in respect of contracts for

**3.** At the time *Petroleum Exploration* was decided, the inadequacy prerequisite was embodied as a statutory rule in former section 267 of the Judicial Code, 28 U.S.C. § 384 (1940). Although the rule is no longer statutory, it retains its binding and nondiscretionary character. *See, e.g., O'Shea v. Littleton,* 414 U.S. 488, 499, 94 S.Ct. 669, 677, 38 L.Ed.2d 674 (1974).

**4.** If Reuber were a federal civil servant, he would have a statutory right to reinstatement and back pay if he prevailed in administrative proceedings, *see* 5 U.S.C. § 7513(a) (1982) but, under the holding in *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), he could not also maintain a *Bivens* action for damages. If Reuber were a state employee, it appears that reinstatement would be available against state officials in their official capacities, *see Hall v. Medical College of Ohio at Toledo,* 742 F.2d 299, 307 (6th Cir.1984) (holding without discussion that reinstatement claim is not barred by state sovereign immunity), while damages would be available against state officials as individuals but, by virtue of state sovereign immunity, not against the state itself. *See Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

**5.** Nor does reinstatement appear to be the ordinary remedy for the new tort of wrongful discharge or retaliatory discharge that some—but by no means all—state courts have fashioned as a limitation on the employment-at-will doctrine. *See, e.g., Holien v. Sears, Roebuck & Co.,* 66 Or.App. 911, 677 P.2d 704, 708 (1984) (noting that state wrongful discharge statute provides equitable relief, in contrast to the relief available at common law, which permits "general damages but generally not injunctive relief"). Some state courts, however, have founded the wrongful discharge action on contractual grounds and thereby made reinstatement available under some circumstances. *See, e.g., Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 335 N.W. 834, 841 (1983).

personal services is that for breach thereof a party must avail himself of the remedy afforded at law." Am.Jur.2d *Specific Performance* § 164 (1973). Equitable relief in the form of reinstatement, therefore, would appear to be barred in this case on the grounds that Reuber has an adequate remedy at law.

This analysis seems to me defeated, however, by the Supreme Court's decision in *Mount Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), which establishes that the presence of a damage remedy does not bar reinstatement as equitable relief in a constitutional case. In *Mount Healthy,* an untenured teacher alleged that the school board's refusal to renew his contract was in retaliation for his exercise of his first amendment rights. The Court held that "[e]ven though he could have been discharged for no reason whatever ... he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected freedoms." *Mount Healthy,* 429 U.S. at 283–84, 97 S.Ct. at 574. The general rationale for this holding, as stated in *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972), is that

> even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.

It is quite clear that this long-standing principle applies both to the states, as in *Perry* and *Mount Healthy,* and to the federal government. *See, e.g., United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *Cafeteria Workers v. McElroy,* 367 U.S. 886, 897–98, 81 S.Ct. 1743, 1749–50, 6 L.Ed.2d 1230 (1961). It seems equally clear that when the principle is applied to "denials of public employment," *Perry,* 408 U.S. at 597, 92 S.Ct. at 2697, reinstatement is one of the ordinary remedies. *E.g., Mount Healthy,* 429 U.S. at 283–84, 97 S.Ct. at 574–75; *Bueno v. City of Donna,* 714 F.2d 484, 495 (5th Cir.1983) ("reinstatement is normally 'an

integral part of the remedy for a discharge which contravenes the first amendment'"). The question, then, is whether the availability of reinstatement as a non-statutory remedy for constitutional denials of public employment belies the argument that damages are an adequate remedy at law.

In large part the answer to this question is supplied by the fact that damages against the government itself, absent a statutory or other waiver, are barred by sovereign immunity. *See generally Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Since that is so, there is clearly no adequate remedy at law against the sovereign, and it would be strained indeed to bar reinstatement on the basis of the possible personal liability of the state or federal officials.

This reasoning, however, does not suffice to explain *Mount Healthy,* because the Court in that case also held that the local school board was not entitled to assert the sovereign immunity defense. 429 U.S. at 280–81, 97 S.Ct. at 572–73. The Court did not discuss the inadequacy prerequisite to equitable relief. This omission is not surprising, since the Court simply assumed, without deciding, that a cause of action could be stated directly under the fourteenth amendment and brought under general federal-question jurisdiction. 429 U.S. at 279, 97 S.Ct. at 572. The absence of any direct consideration of the proper remedies under the assumed cause of action may make *Mount Healthy* less than compelling precedent for abandoning the inadequacy prerequisite in fashioning relief against governmental entities that cannot assert sovereign immunity. At a minimum, however, the fact that the Court allowed the action for reinstatement to go forward on remand must mean that the availability of a damages remedy is not, standing alone, enough to bar reinstatement in a constitutional case. We, of course, are bound by that determination. Therefore, unless this case can fairly be brought outside the probable rationale for this respect of *Mount Healthy,* Reuber's claim for reinstatement must be remanded to the district court.

Because the Supreme Court did not articulate its rationale, some degree of speculation is necessary to resolve this problem. One explanation for this apparent exception to the inadequacy prerequisite is that an unconstitutional discharge from employ-

ment is null and void—the court in effect orders the employer to allow the employee to resume a position he never legally lost. This rationale, which employs a legal fiction akin to that announced in the sovereign immunity context in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), is as plausible when applied to a private employer who terminates an employee under circumstances in which the employer is an ad hoc federal agent as it is when applied to a federal official.

An alternative rationale for holding that damages are not adequate relief where government has unconstitutionally discharged a public employee is that government should not be allowed to "buy back" the limitations placed on its powers by the federal Constitution. That rationale, too, is applicable here, for a refusal to allow reinstatement here would allow the government to achieve the same unconstitutional result, albeit with someone else's money. The threat of damages might suffice to deter private employers from implementing the unconstitutional government decision in the first place, but that argument proves too much: the same threat might deter governmental officers from engaging in unconstitutional conduct, yet the availability of an action for damages against those officers does not bar reinstatement under *Mount Healthy.*

This leaves only the fact that Reuber's employer has reverted to private status for the future as a basis for distinguishing this case from *Mount Healthy.*[6] It is true that injunctive relief would operate in the future, and hence in one sense would implicate the interests of a private employer in making its own personnel decisions. However, reinstatement is at bottom a backward-looking remedy, just as damages are;

it serves to redress a wrong that has already taken place rather than to prevent a wrong that may occur in the future. Since Reuber alleges that he was constructively discharged at a time when his employer was acting as a federal agent, and since reinstatement relates back to that time, the employer's private status does not suffice to take this case outside the ambit of *Mount Healthy.* It follows that binding precedent requires us to hold that Reuber's claim for reinstatement is not barred by the availability of damages against his employer. But for that precedent, the analysis set out above might persuade me that no action for reinstatement would lie.

Reuber's request for expungement of his employment records must also be allowed to go forward. The power of the federal courts to direct expungement of government records gathered or maintained in violation of the first amendment is well-established. *E.g., Hobson v. Wilson,* 737 F.2d 1, 65 (D.C.Cir.1984); *Chastain v. Kelley,* 510 F.2d 1232 (D.C.Cir.1975). "[T]he correction of records is an equitable remedy designed to correct, not compensate for, the violation, and may be essential to prevent future harm as a result of the original violation." *Carter v. Orleans Parish Public Schools,* 725 F.2d 261, 263 n. 4 (5th Cir.1984). The district court must, however, find that there is a real and immediate threat of irreparable harm before it can allow expungement, and on these facts that means it must find a threat of continuing or future conspiracy between the federal government and the corporate defendants. It is clearly relevant to that determination that Reuber would have a constitutional tort claim for damages from any retaliatory use of his employment records. Moreover, before the court may order expunge-

---

**6.** Although Reuber's allegations require us to treat his employer's "constructive discharge" of him as state action, his allegations do not suffice to make his employer's normal business operations state action. Reuber's employer is engaged in an ongoing contractual relationship with the federal government, but neither the extent of the employer's entanglement nor the nature of the functions it is performing appears to satisfy the standards for state action set forth in cases such as *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), and *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). Cancer research is not "a function that has been traditionally the ex-

clusive prerogative of the State.'" *Blum,* 457 U.S. at 1011, 102 S.Ct. at 2789 (citation omitted); similarly, while Reuber's employer derived a significant amount of its business from its contract to operate the government-owned research facility at which Reuber worked, this "fiscal relationship with the State is not different from that of many contractors performing services for the government." *Rendell-Baker,* 457 U.S. at 843, 102 S.Ct. at 2772. Hence, although Reuber's employer is a state actor for purposes of a damages action, it has reverted to private status for the future—the period during which injunctive relief in the form of reinstatement would operate.

ment it must balance the potential harm to the plaintiff against the importance to the employer of maintaining the records in question. *See Hobson,* 737 F.2d at 66. These conditions may make it difficult for Reuber to prevail on his expungement claim, but the finding as to threat of harm and the balancing of relevant interests are fact-laden determinations that must be confided to the discretion of the district court.

STARR, Circuit Judge, dissenting in part and concurring in part:

While I fully concur in Parts I–III of the majority opinion, I respectfully dissent as to Part IV. I would affirm the District Court's dismissal of the federal claims against Litton Industries and Litton Bionetics (the "Litton corporate defendants") on the ground that they fail to state a claim on which relief can be granted. In my view, special factors counsel strongly against implying a constitutional tort action or allowing injunctive relief against these private entities in the circumstances before us. I would also affirm the dismissal of the pendent state law claims as within the sound discretion of the District Court.

As the majority opinion notes, the District Court appears to have dismissed Dr. Reuber's claims against the Litton corporate defendants for lack of federal subject matter jurisdiction. Any such dismissal would be in error, as the majority rightly concludes. Nonetheless, this court can properly affirm the dismissal under Fed.R. Civ.P. 12(b)(6) if the complaint fails to state a claim upon which relief can be granted. *See Boykin v. District of Columbia,* 689 F.2d 1092, 1099 (D.C.Cir.1982) (under general rule that appellate court may affirm on a ground other than that adopted by the District Court, it was proper to affirm under Fed.R.Civ.P. 12(b)(6) a dismissal grounded upon lack of subject matter jurisdiction). Dr. Reuber's complaint states a claim only if a constitutional damages ac-

tion or prayer for injunctive relief can be brought against private individuals or entities under the circumstances presented here. The majority holds that such an action or prayer may be brought against the Litton corporate defendants. It is on that point that I am constrained to part company with my colleagues.

I

As the majority opinion notes, the availability of constitutionally based actions for money damages, which began in the Fourth Amendment setting with the watershed case of *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), has been extended to permit actions implied under several provisions of the Bill of Rights. Despite this extension, however, it is clear that courts are not rigidly to imply a constitutional damages action in circumstances in which it would be inappropriate. To the contrary, the Supreme Court in *Bivens* expressly observed the absence "of special factors counselling hesitation in the absence of affirmative action by Congress" before permitting the constitutional damages action there to go forward. In subsequent cases decided in *Bivens'* wake, the Court has emphasized that the presence of such special factors may defeat the implication of a cause of action. *See Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 2363, 76 L.Ed.2d 586 (1983); *Carlson v. Green,* 446 U.S. 14, 18, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15 (1980); *Davis v. Passman,* 442 U.S. 228, 245, 99 S.Ct. 2264, 2277, 60 L.Ed.2d 846 (1979). And as we shall presently see, this circuit has already held in circumstances not dissimilar to those before us that special factors militate against implying a cause of action.

Clearly, a *Bivens* action can be brought only against an individual or entity engaged in governmental (or "state") action,[1] that is, one who is acting under color of

---

1. For a *Bivens*-type claim, federal rather than state action must be alleged. Both sorts of action are usually referred to as "state action."

The term is used here to denote federal governmental action.

federal law. In order to prevail on his *Bivens* claim, Dr. Reuber would thus have to prove that officers or employees of the Litton corporate defendants conspired with federal officials to deprive him of his First Amendment rights.[2] We cannot resolve this fact-bound issue here, since on a Fed. R.Civ.P. 12(b)(6) motion to dismiss we must take all of plaintiff's factual allegations as true.

However, as the majority notes, there is a purely legal question that can be addressed on a Rule 12(b)(6) motion. That question is whether, in the circumstances here, a plaintiff should be able, by analogy to 42 U.S.C. § 1983, to bring a *Bivens* action against a private entity when he alleges that the private entity has engaged in state action or, conversely, whether constitutional tort claims can be brought only against federal officials. The majority holds that such an action may be brought against the Litton corporate defendants. I disagree, but do so without concluding that such an action may never lie against a private entity.

The Supreme Court has never had occasion to address this issue. But in addressing the scope of constitutional torts, the Supreme Court has seemed to contemplate only federal officials as defendants. For instance, in *Davis v. Passman, supra,* the Court fashioned an implied damages action for violation of the equal-protection component of the Due Process Clause in circumstances where a Member of Congress discharged a staff member on grounds of gender. A gender-based discriminatory discharge by a covered private employer would, of course, have run afoul of the express prohibitions of Title VII of the 1964 Civil Rights Act, but no such regulatory regime applied to Members of Congress. In examining this situation, where the failure to imply a cause of action under the Constitution would have left Ms. Davis wholly remediless, the Court emphasized that creation of a judicially implied federal cause of action was appropriate since the action "involves the application of the Fifth Amendment to a *federal officer* in the course of his federal duties." *Id.* at 246 n. 23, 99 S.Ct. at 2277 n. 23 (emphasis added). *See also Carlson v. Green, supra,* 446 U.S. at 18, 100 S.Ct. at 1471 (1980) (stating that "*Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the *official* in federal court despite the absence of any statute conferring such a right" (emphasis added)).

Only one circuit court has spoken directly to the issue whether private individuals or entities may ever be sued under *Bivens.* In *Fletcher v. Rhode Island Hospital Trust Bank,* 496 F.2d 927 (1st Cir.1974), the First Circuit held flatly that a bank could not be sued under a constitutional tort theory. The court stated that "[w]hile federal officers may, at times, be subject to suit for unconstitutional behavior, there is no cause of action against private parties acting under color of federal law or custom." *Id.* at 932 n. 8 (citation omitted).[3]

2. Conspiracy with a state official can give rise to state action for purposes of 42 U.S.C. § 1983. In *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 155–56, 90 S.Ct. 1598, 1607–08, 26 L.Ed.2d 142 (1970), the Supreme Court held that the under-color-of-state-law requirement of § 1983 would be satisfied if it was shown that a restaurant's employees conspired with the sheriff to deprive the plaintiff of federal rights. In *Lugar v. Edmundson Oil Co.,* 457 U.S. 922, 941, 102 S.Ct. 2744, 2756, 73 L.Ed.2d 482 (1982), the Court again held that such a conspiracy can constitute state action.

3. Although the First Circuit did not articulate at length its rationale for refusing as a general rule to imply a constitutional damages action in the absence of congressional action, reasons for such a conclusion may be readily supplied. First and foremost, there is less need for constitutional damages actions to restrain private individuals from delicts, since unlike federal officials they do not enjoy immunity from state common law torts. *See infra* at pp. 1074–75. Second, limiting the class of potential defendants to federal officials delimits the number and variety of suits that can be brought. Conversely, the ability to sue any individual under any Amendment by merely alleging a conspiracy with government officials may open wide the floodgates of litigation with little, if any, justification for such an extraordinary result. Finally, private individuals, unlike federal officials, must pay the cost of defending such suits; thus, a greater potential for harassment exists when

Other circuits have assumed without deciding that private individuals may be sued under *Bivens* and then held that the requisite state action was not present.[4] As far as I am aware, no circuit, however, has ever held a private party liable in a constitutional damages action.

In *Zerilli v. Evening News Association*, 628 F.2d 217 (D.C.Cir.1980), this court expressly left open the broad question whether *Bivens* liability extends to private individuals or entities under any circumstances, but decided that a defendant's private status is one of the "special factors" that should "counsel[ ] hesitation in implying a *Bivens* cause of action in the absence of affirmative action by Congress." *Id.* at 223 (quoting *Bivens v. Six Unknown Named Agents, supra*, 403 U.S. at 396, 91 S.Ct. at 2004). The court also held that the values served by "free and vigilant press"

would be harmed by allowing the suit to go forward.[5] *Id.* at 224.

Thus, besides standing for the sound and sensible proposition that a defendant's private status is in itself a factor counselling hesitation,[6] *Zerilli* demonstrates that this court is to assess the circumstances of a suit against a private party with especial care to determine whether this particular kind of constitutional tort action is warranted. Thus, it should no longer be open to a panel of this court to hold that courts should entertain constitutional damage actions against private individuals to the same extent as actions against federal officials as long as state action is alleged. Since *Zerilli* held that the private status of the defendant is itself a factor counselling hesitation and dismissed the plaintiffs' constitutional tort claim *despite* their allega-

causes of action are implied against private individuals.

**4.** For instance, in *Fonda v. Gray*, 707 F.2d 435, 437 (9th Cir.1983), the Ninth Circuit "assumed without deciding that private parties may be liable under a *Bivens* action under principles similar to those developed under 42 U.S.C. § 1983." However, the court then held that the mere acquiescence of the defendant banks to a federal investigator's request for financial information was insufficient to prove a conspiracy between the private parties and the Government and thus that the banks' actions were not "sufficiently intertwined" with that of the FBI to hold them liable under Ms. Fonda's constitutional claims. *Id.* at 438. *See also Writers Guild of America, West, Inc. v. American Broadcasting Co.*, 609 F.2d 355, 360 (9th Cir.1979) (suggesting that, in certain circumstances, it may be appropriate to "fashion [ ] a cause of action for damages against ... private defendants based on [*Bivens* ]").

In *Yiamouyiannis v. Chemical Abstracts Service*, 521 F.2d 1392 (6th Cir.1975), the Sixth Circuit might be viewed as having assumed the existence of a constitutional tort action against a non-governmental defendant. The issue arose in a summary judgment context, and the court found that several issues of fact remained unresolved. Among those issues, and one "[f]undamental to appellant's cause of action, ... [was] proof that his discharge was 'state action.'" *Id.* at 1393. The court felt that the plaintiff should be allowed the opportunity to show that the defendant was "federally funded to the extent that his [plaintiff's] discharge must be regarded as governmental action." *Id.* The court's view would be more appropriately characterized not

as recognizing a constitutional tort action against a non-governmental defendant but rather as holding that, by being federally funded, an entity may become a federal actor. That line of analysis is clearly cut off by the later Supreme Court holding in *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (state funding of a facility does not convert action by that facility into state action).

**5.** In *Stevens v. Morrison-Knudsen Saudi Arabia Consortium*, 576 F.Supp. 516 (D.Md.1983), the court followed *Zerilli*'s approach. In that case employees who had been imprisoned in Saudi Arabia for the possession of marijuana brought a constitutional action against their private employer, alleging that it had violated their Fourth, Fifth, and Sixth Amendment rights in cooperating with the Saudi Arabian authorities. Plaintiffs alleged that their employer's action constituted state action because of the Army Corps of Engineers' supervision of their employer's construction projects in Saudi Arabia. Before reaching the state action issue, the *Stevens* court determined that no *Bivens* cause of action should be implied against the private company. Relying on *Zerilli*, the court held that the employer's private status was a factor that counseled hesitation in implying an action to recover damages under the Constitution. *Id.* at 521. The court also emphasized that the alleged violations had taken place in a foreign country which had threatened representatives of the employer in order to obtain their cooperation. *Id.*

**6.** For a discussion of reasons that the private status of the defendant should in itself be a factor counselling hesitation, see *supra* note 3.

tion of state action, it is clear to me that, at least until such time that the law in this circuit is changed, a *Bivens*-type suit is not commensurate with section 1983 actions in its capacity to reach private individuals or entities.

This reading of the law of this circuit seems entirely unexceptional. Yet, the majority appears implicitly to overturn *Zerilli*, which of course it is powerless to do. In the majority's view, a private actor may lose his private status shield if he acts so as to create an alliance with the Government. Since such action is obviously the only way in which a non-federal actor can come within the scope of section 1983 (and now *Bivens*) actions, private-status seems abruptly to have lost all effect in *Bivens* analysis. This U-turn in the law is much to be regretted, jettisoning as it does the more gradualistic approach embodied in *Bivens* analysis.

Indeed, I am firmly persuaded that the common-law method of adjudication, as manifested by *Bivens* and its progeny, is vastly superior to the more beguilingly simple determination either that a constitutional tort action against a private individual or entity is always unwarranted or, conversely, as the majority holds, that it is always permissible so long as a conspiracy between federal officials and private individuals or entities is alleged. In this respect, Justice Harlan's comments in his *Bivens* concurrence are particularly *a propos:*

> In resolving [the question of whether a constitutional tort is appropriate], it seems to me that the range of policy considerations we may take into account is at least as broad as the range of those a legislature would consider with respect

to an express statutory authorization of a traditional remedy.

*Bivens v. Six Unknown Named Agents,* 403 U.S. at 407, 91 S.Ct. at 2010 (Harlan, J., concurring).[7]

In this case, three special factors militate against the implication of a constitutional tort claim, in addition to the critical factor that the claim is asserted against private parties. First, this litigation is directed against a corporate employer in the wake of disciplinary action taken against one of the firm's employees; this is not simply a suit brought against private parties *simpliciter*. The underlying controversy that gave rise to this litigation arose in consequence of Dr. Reuber's expressing his personal views on the *very subject matter of his employer's business activities*, namely research into the carcinogenicity of chemicals. Cancer research was, after all, what Litton Bionetics' business at Frederick was all about. Dr. Reuber was not reprimanded for activities bearing little if any relationship to his employer's business, such as speaking out on non-NCI issues of public interest or moment.[8] But that is not all. In addition to the substance of his activities, Dr. Reuber was also under fire for allegedly failing to follow company procedures, such as the charge that he failed to indicate clearly to readers of his manuscripts that the research and conclusions were his own, rather than those of the well-known cancer research center where he was employed. So too, the charge was made that Dr. Reuber had spent too much company time conducting his own independent research. It cannot be gainsaid that these issues, whatever their merits,[9] go to the heart of the employment relationship.

7. In evaluating whether a cause of action should be created, a legislature is properly concerned not only with the social benefits that such a cause of action would bring when proved, but also with the potential social harm that unfounded suits brought in the form of the novel cause of action would cause. In short, a rational legislature would weigh the utility brought about by justified suits against the disutility which would result from unjustified suits before creating a new cause of action. Similarly, in deciding whether a constitutional cause of action should be implied against a private individ-

ual in these circumstances, we are concerned with the systemic consequences of such an implication.

8. We are not here faced with that issue, and accordingly, I express no views on it.

9. The merits of these questions are not before us, and I therefore do not address them. We have, however, been apprised that in the Privacy Act proceeding in the District Court, the court determined in a September 7, 1984 memoran-

Federal judicial intrusion into that complex and sensitive relationship, in the utter absence of congressional authorization, is a giant leap not lightly to be undertaken. Unlike the majority, I would emphatically decline to undertake such a jump. Congress, of course, has seen fit over the years to regulate in detail private employment relationships, through laws ranging from anti-discrimination statutes to health and safety regulations. It has not, however, elected to regulate all incidents of the employment relationship, leaving to the marketplace and state law fields such as that into which Dr. Reuber now beckons us to enter.

The importance of exercising judicial restraint in the *federal* employment setting has been clearly stated by the Supreme Court. In *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), and *Chappell v. Wallace, supra,* the Court declined to create *Bivens* actions with respect to federal civil and military personnel matters. Guided by the fact that such employment relationships are "governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States," *Bush v. Lucas, supra,* 103 S.Ct. at 2406, the Court determined that it was best left to Congress to prescribe the scope of relief for federal employees whose First Amendment rights were violated by their superiors. *Id.* at 2412.[10] Even though the dispute in *Bush v. Lucas* related to an employee's constitutional rights, the ultimate question was deemed by the unanimous Court to be one of " 'federal personnel policy.' " *Id.* at 2412.

So too, Dr. Reuber's claim squarely fits within the ambit of personnel policy of the two private employers. And, critically, the personnel policies are those of a government contractor carrying on vital research of great interest to the Congress and the Nation as a whole. Congress is scarcely a stranger to issues arising between federal agencies and government contractors carrying on federally funded activities, such as the cancer research activities which provide the backdrop for this litigation. Indeed, the relationships between federal agencies and their contractors are regulated extensively by statute and by regulations enjoying the force of law. Activities by such contractors are, moreover, subject to meticulous agency oversight—and at times congressional oversight—and audit by federal authorities. In a word, it is better for Congress, rather than the courts, to determine whether to launch into the deep waters of federal government contractors' personnel policies.

Second, inasmuch as the thrust of Dr. Reuber's complaint is that the reprimand contained inaccurate information and unfair accusations, he enjoys and indeed has already sought recourse to the common law of libel as an alternative remedy to redress his injuries. It is therefore more appropriate that Dr. Reuber be directed to this well-articulated body of law, rather than to require this court to create a novel and probably superfluous cause of action. This is particularly true since the practice of considering whether the plaintiff has an alternative remedy before implying a tort action from the Constitution is well established by Supreme Court precedent. *See,*

dum opinion and order that certain allegations against Dr. Reuber set forth in the March 1981 letter of reprimand were in fact false, including the charge that he knowingly bypassed internal clearance procedures and that he implied that NCI and the Frederick Cancer Research Center endorsed his views. Memorandum Opinion at 31.

**10.** It cannot be doubted that the regulatory and remedial regime crafted by Congress over the years failed to provide federal employees with the full panoply of remedial rights that would be enjoyed by virtue of creating a *Bivens* action.

The Court could not have been clearer in assuming that (1) a violation of the federal employee's rights had occurred, and (2) *the civil service remedies were not as effective as an individual damages remedy and did not fully compensate the employee for the harm he suffered in consequence of the First Amendment violation.* 103 S.Ct. at 2408. Notwithstanding this undisputed remedial gap, the unanimous Court left to the Congress the policy choice of bridging the gap or leaving it alone. We should do the same here.

*e.g., Davis v. Passman, supra,* 442 U.S. at 245, 99 S.Ct. at 2277 (1979) (stating that "since respondent is no longer a Congressman ... equitable relief in the form of reinstatement would be unavailing. And there are available no other alternative forms of judicial relief.").

To be sure, when the Court has refused to imply a tort action under the Constitution, it has looked to an alternative remedy under federal law. *See, e.g., Bush v. Lucas, supra* (holding that it would be "inappropriate" for the court to create a constitutional action on behalf of a federal employee for alleged defamation and alleged retaliatory demotion in light of the provisions passed by Congress to provide substantive and procedural remedies to federal employees). However, I do not think that the fact that the source of the alternative remedy is state law precludes us from treating it as a factor militating against the creation of a new cause of action against *private parties.* Private parties do not, of course, possess immunity that federal officials enjoy for common law torts, *see Barr v. Matteo,* 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434 (1959) (holding that federal officials have absolute immunity from common law tort liability if their actions are "taken ... within the outer perimeter of [their] line of duty").[11] *See also McKinney v. Whitfield,* 736 F.2d 766 (D.C. Cir.1984) (holding that alleged assault and battery of an employee was not within a supervisor's outer perimeter of his line of duty). Thus, Dr. Reuber, unlike Mr. Bivens, does not have to resort to a constitutional tort claim to recover damages. *Cf. Bivens, supra.* 403 U.S. at 410, 91 S.Ct. at 2012 (Harlan, J., concurring) (stating that "[f]or people in Bivens' shoes, it is damages or nothing").[12]

Third, since, as we have just seen, Dr. Reuber enjoys access to the common law remedies provided by the law of defamation, it is manifest that his cause of action here implicates First Amendment values which, as in *Zerilli,* counsel restraint on

**11.** Judge Bork, in his concurring opinion, having raised the Litton corporate defendants to the status of federal actors, would grant the possibility of invoking official immunity as a defense. The qualified immunity that protects federal officials in *Bivens* actions would thus protect, in the appropriate circumstances, the Litton corporate defendants as well. While I disagree with his raising the Litton corporate defendants to the status of federal actors, it does seem logical, having so raised them, also to grant them the official immunity enjoyed by true federal actors.

**12.** The majority contends that under *Carlson v. Green, supra,* the availability of an alternative remedy is relevant to *Bivens* analysis only when "explicitly provided by Congress [as] an equally effective, *substitute* remedy." Majority Opinion at 1056 (emphasis in original). *Carlson,* however, concerned whether to *pre-empt* a *Bivens* action against a federal actor by virtue of the existence of an alternative statutorily provided remedy. Here we are being asked to *create* a *Bivens*-like action against two private corporations; it is thus appropriate to go beyond the factors found relevant in *Carlson.*

To be sure, Dr. Reuber also claims that his Fifth Amendment due process rights were violated because of Litton's and Bionetics' failure to conduct a hearing before issuing the reprimand. As a practical matter, appellant's libel claim will allow him to recover for any injury proximately caused by the reprimand if the Bionetics reprimand was untrue. If the reprimand was accurate, however, plaintiff would face many obstacles in recovering actual damages. In *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Supreme Court held that in order to collect actual damages a person who was justifiably deprived of a constitutionally protected liberty interest, albeit without the process he was due, had to prove that his injury flowed from the defective process rather than the justifiable deprivation. Thus, in this case, Dr. Reuber would have to show that his injuries were not caused by the reprimand itself but by the absence of due process in issuing the reprimand.

Moreover, the factors which counsel against the creation of a First Amendment tort counsel with equal if not greater force against the creation of a Fifth Amendment tort against a private corporation in these circumstances. Since state libel law provides a remedy against a false reprimand, a corporation's verbal disciplining of its employee does not run afoul of "the central thrust," *see Zerilli,* 628 F.2d at 223, of the Due Process Clause. *Cf. Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (holding that the post-deprivation state tort remedy constitutes the process that was due a child disciplined through the use of corporal punishment since predeprivation hearings would divert resources from a school's essential pursuits).

our part. In the past two decades, the law of defamation, particularly in the context of alleged defamatory statements that, as here, find their way into the press and become themselves matters of public interest and comment, has been the avenue for the judiciary's delicate effort to accommodate the competing values of an individual's interest in reputation and the First Amendment value of "uninhibited, robust and wide-open" communication. *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964).

It cannot be gainsaid that Dr. Reuber's lawsuit touches upon First Amendment interests in full and open discourse and debate. Dr. Reuber, after all, was reprimanded after inserting himself into a scientific controversy in the midst of a raging debate over the health threat allegedly posed to the general public in consequence of the widespread spraying of malathion in California. And his lawsuit was based, at least in part, not on the reprimand *simpliciter* but on the fact that the reprimand found its way onto an EPA bulletin board and into a trade press publication. In essence, Dr. Reuber's First Amendment complaint is an attack on a written communication which itself indisputably triggers First Amendment concerns.[13]

It is too late in the day to question that Litton and Bionetics, as private corporations, have First Amendment rights. *See First National Bank v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (holding that corporate speech enjoys the protection of the First Amendment). Their exercise plainly may be deterred by allegations such as Dr. Reuber's that are essentially dependent on attacking the content of a corporate communication relating to the conduct of an employee. I need not, and do not, conclude that to imply a cause of

action under the Constitution here would run afoul of the First Amendment; but I would conclude that, as in *Zerilli,* the presence of sensitive First Amendment considerations counsels caution and prudence in embracing Dr. Reuber's novel claim against private parties. Moreover, in evaluating whether to imply a new, constitutionally based remedy, we cannot overlook the values of the free and uninhibited flow of information within the firms in enabling private corporations like Bionetics and Litton to operate efficiently.[14] I would therefore decline to imply a constitutional tort action against either of the private corporate defendants.

## II

In my view, Dr. Reuber's prayer for injunctive relief based on alleged constitutional violations by two private companies likewise founders by virtue of the presence of factors that counsel the judiciary to exercise restraint in the absence of Congress' express action. First and foremost, Dr. Reuber is seeking to create a cause of action against a private party, a factor of elemental importance in our evaluation of the appropriateness of creating a new cause of action for injunctive relief. The status of Litton and Bionetics as private actors renders the extraordinary measure of judicially fashioned injunctive relief even more intrusive in the private ordering of relationships and affairs than a less heroic prayer for money damages under *Bivens.* This is particularly true where, as here, the injunctive relief sought is mandatory in nature. Dr. Reuber is not seeking a prohibitory injunction that would require the private defendants to cease and desist from an ongoing practice claimed to impinge upon the litigant's First Amendment inter-

---

**13.** The majority suggests that this analysis mischaracterizes the gravamen of Dr. Reuber's complaint. *See* Majority Opinion at 1059. I do not, however, maintain that Dr. Reuber's complaint was based solely, or even in greatest part, on the posting or other publication of the letter of reprimand. Rather, I merely note that those events form a part of the basis of the complaint. To the extent that the publication contributes to

that basis, First Amendment concerns are plainly involved and appropriately become relevant factors in our inquiry.

**14.** That is not to say that employees aggrieved by corporate communication stand remediless, for that is the very purpose of the common law of defamation.

ests. Quite to the contrary, he is seeking an order requiring his "reinstatement" in the employ of Litton Bionetics.[15] While Congress has fashioned such remedies in private employment settings, as in the law of Title VII, it has not elected to erect the exercise of constitutional rights, including First Amendment liberties, as a cause of action against private employers. By virtue of the manifest and continuing disruption of private relationships entailed by a mandatory injunction of the sort sought here, we should be guided away from fashioning yet another federal instrument of litigation, as opposed to reliance upon the rights and remedies carefully developed and refined over the centuries in the accumulated body of the common law.

The novelty of the majority opinion is reflected by the authorities on which it relies. Indeed, there should be no doubt whatever that the court is breaking entirely new ground. For instance, *Bartel v. Federal Aviation Administration*, 725 F.2d 1403 (D.C.Cir.1984), on which the majority heavily relies, did not involve private actors at all, but to the contrary, as the style of the case itself suggests, the action was brought against governmental entities or actors.[16] That is, of course, the very stuff of which *Bivens* jurisprudence is and has been made. It is, in a word, one thing to sue the FAA and its officials, but it would be quite another to sue, say, a private airline which enjoys the benefit of government contracts, with no basis for the action either in federal statutory law or the common law.[17] *See also Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946);

*Philadelphia Co. v. Stimson*, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570 (1912).

### III

Since I would affirm the dismissal of Dr. Reuber's federal claims, I would also uphold the District Court's dismissal of the various common-law claims. The doctrine of pendent jurisdiction is, of course, a salutary principle promotive of judicial economy by permitting the plaintiff to try his or her entire case in one forum at one time. But as *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), made clear, the application of this principle is entrusted to the sound discretion of the federal district courts. I can find no warrant here, where I would dismiss all the federal claims save for the Privacy Act claim, for overturning as an abuse of discretion the District Court's dismissal of the pendent state law claims. Such matters should by and large be entrusted to the good judgment of our District Judges, who are peculiarly well situated to determine the most orderly and appropriate means for the just and expeditious resolution of federal civil litigation.

---

**15.** It will be recalled that Dr. Reuber resigned, pursuant to medical advice, from his position at Litton Bionetics. He was thus not discharged by the direct action of his employer; that is, the employer did not order him to depart from the company's precincts. Rather, Dr. Reuber rather expansively maintains that he was "constructively discharged" by virtue of the letter of reprimand and the unhappy events which followed in the wake of that letter.

**16.** Of course, the majority, taking the plaintiff's allegations as true, holds that the Litton corpo-

rate defendants are federal actors. I do not believe that private entities, even when acting in concert with the federal government to the degree alleged here, may be equated with true federal actors with regard to the availability of injunctive relief.

**17.** I recognize, of course, that suits have historically lain to enforce a federal *statutorily* created liability. *See Holmberg v. Armbrecht*, 327 U.S. 392, 394–95, 66 S.Ct. 582, 583–84, 90 L.Ed. 743 (1946).